[No. S006014. Dec. 13, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ARMENIA LEVI CUDJO, Defendant and Appellant.

586

594

## COUNSEL

Michael A. Kahn and Wesley D. Hurst, under appointments by the Supreme Court, Katharine Livingston, Margaret E. Murray, Robert S. Siltanen, Katherine A. Wine, Robert E. Stenson and Folger & Levin for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter, Donald E. de Nicola, Roy C. Preminger, Susan Lee Frierson and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—In this death penalty case, a jury convicted defendant Armenia Levi Cudjo of the first degree murder of Amelia P. (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated); it found that defendant used a deadly weapon to commit the murder (§ 12022, subd. (b)) and that defendant committed the murder while engaged in the commission of robbery (§ 190.2, subd. (a)(17)(i)) and burglary (§ 190.2, subd. (a)(17)(vii)). The jury also convicted defendant of one count each of robbery (§ 211) with the use of a deadly weapon (§ 12022, subd. (b)) and burglary of an inhabited dwelling (§§ 459, 462, subd. (a)).

The jury fixed the penalty for the murder at death. The trial court denied the automatic motion to modify this penalty verdict (§ 190.4, subd. (e)), stayed the pronouncement of sentence on the noncapital counts, and sentenced defendant to death. Defendant's appeal from the judgment is automatic. (§ 1239, subd. (b).)

We conclude that the judgment should be affirmed in its entirety.

## I. FACTS AND PROCEEDINGS

### A. *Guilt Phase*

#### 1. *Prosecution evidence*

On March 21, 1986, Los Angeles County sheriff's deputies found the body of Amelia P. in the master bedroom of her home in the desert community of Littlerock, in the County of Los Angeles. The body was face down on the floor, with the hands tied together behind the victim's back, the ankles tied together, and the hands tied to the ankles. These bindings were made with neckties belonging to the victim's husband, Ubaldo P. A piece of cloth was found in the victim's mouth, secured by a necktie tied around the victim's head and upper neck.

The body was clothed only in a robe. On the floor near the body were the victim's underwear, socks, and running shoes, as well as a bloodstained hammer and the broken tip of a fireplace poker. The cause of death was multiple blows to the back and sides of the head, fracturing the skull and lacerating the brain. Semen was present on the victim's right inner thigh and genital area, but there were no indications of traumatic sexual assault. Based on the temperature of the liver when the body was found, death was estimated to have occurred between 8:10 a.m. and 12:30 p.m. that day. The

victim's blood tested negative for alcohol and an array of illegal drugs, including cocaine.

Kevin P., the youngest of the victim's sons, was five years old on the day of his mother's death, and seven years old when he testified at trial. According to that testimony, a Black man Kevin had never seen before entered the house with a knife in his hand. The man had no facial hair and no tattoos on his arms. It was before lunch, and Kevin was under a table in the living room watching television. The man, who was wearing a sleeveless blue top and dark blue cut-off pants, put the knife to the victim's neck and demanded money. As Kevin described it, the knife was black with a "little round silver ball around it, and it was a survival knife." At the man's direction, Kevin retrieved the keys to the family van from the kitchen and gave them to the man. The man tried to start the van but was unable to do so. The man then took the victim to the master bedroom, where the man tied up the victim. From the closet in the master bedroom, the man removed two guns belonging to Kevin's father. Kevin went into his own bedroom and stayed there for a long time. Some days later, Kevin attended a lineup but did not identify anyone.

Ubaldo P. testified that he had left the house that morning between midnight and 1 a.m. to go to work 77 miles away in the City of Commerce. When he returned at 5 p.m., the sheriff's deputies were already there. Missing from the house were an M-1 carbine, a 30.06 rifle, and an army duffel bag. The victim's jewelry case, usually kept in the bedroom, was in the family van. The hammer found on the bedroom floor was normally kept in a toolbox in the garage. The fireplace poker was in its usual place, but there were bloodstains on the shaft and the tip had been broken off. The victim was very neat and normally did not leave her clothing on the floor. He had no reason to suspect that she was abusing drugs or alcohol.

Investigating officers found the keys to the van outside the victim's house, about 30 feet from the rear garage door. Nearby, the officers found a single set of shoe prints leading away from the house. It had rained the previous day, making a crusty surface. The officers followed the tracks for about a third of a mile, at intervals observing marks consistent with an object such as a rifle dragging on the ground. The tracks led to a camper, from which the victim's house was easily visible.[1] The officers ordered the occupants to leave the camper. Defendant and his brother Gregory emerged from the camper and were taken into custody.

---

[1] The tracks mentioned in the text were not the only ones found in the area. A thorough examination by investigating officers disclosed tracks made by the same or virtually identical shoes on roads to the east and west of the victim's house and Cudjo camper. (The camper was north of the victim's house, separated by an expanse of roadless desert.) On the road to the

Inside the camper, the officers found a pair of MacGregor athletic shoes that could have made the shoe prints. The officers found an identical pair of athletic shoes behind the front seat of an automobile belonging to defendant's mother, Maxine Cudjo. Unlike the shoes found in the camper, the shoes found in the automobile were "very wet."

In addition to the shoes, the officers found a black survival knife and a pair of cut-off blue jeans in the Cudjo camper. When shown these articles at trial, Kevin testified that the knife was different from the knife wielded by the man who had assaulted his mother, and that the cut-off pants the assailant had worn were similar to, but shorter than, the ones found in the Cudjo camper. No firearms were found in the camper or in Maxine Cudjo's automobile.

Maxine Cudjo testified that on the day of the murder she was living in the camper. Defendant and Gregory had slept in the camper the previous night, as they occasionally did. She spent most of that morning in the house next door, doing housework for the man who owned the land under the camper. Returning to the camper at 11 a.m., she found defendant and Gregory, both wearing their MacGregor athletic shoes. The three of them went in Maxine's car to the post office and then to the residence of Julia Watson, one of Maxine Cudjo's daughters. Maxine returned to the camper; a little while later, at about 1:30 p.m., she departed again in her car to visit friends, leaving defendant and Gregory in the camper. On her next return to the camper, at approximately 4 p.m., sheriff's deputies had taken her sons into custody.

Julia Watson testified that her mother had visited her house that day with defendant and Gregory at approximately 1 or 2 p.m. Defendant was wearing cut-off jeans and work boots; Gregory wore shorts and tennis shoes.

Gregory Cudjo did not testify at trial, but the prosecution introduced evidence of the testimony he had given at defendant's preliminary hearing and statements he had made to investigating officers during a tape-recorded interview the morning of the day after the murder of Amelia P. In these prior statements, Gregory maintained that he had remained in the camper throughout the morning of the murder until his mother returned at approximately 11 a.m. During this time, he alternately slept and listened to a professional baseball game on the radio. He said defendant was gone from the camper for

---

west, there were two sets of tracks, both heading south. On the road to the east, there were two sets of tracks, one heading north and the other south. In addition, two sets of tracks led away from the Cudjo camper, heading east, and a single set of tracks led to the victim's house from the house immediately to the west.

about two hours, leaving at about the time the baseball game started and returning at the same time as Maxine. During the taped interview, Gregory said that later that afternoon defendant had washed off his MacGregor athletic shoes when they were at Julia Watson's house.

Analysis of semen found on the victim's external genital area and right inner thigh revealed that it could have come from defendant but could not have come from Gregory Cudjo or from Ubaldo P.[2]

### 2. *Defense evidence*

Defendant testified in his own behalf. He admitted that he knew Amelia P., that he had been in her house on the morning of her death, and that he had had sexual relations with her, but he denied that he had killed her. He said he had seen Amelia P. on three occasions before the day of her death.

Defendant explained that he and a woman named Iris Thomas had worked together selling cocaine, and that he had derived most of his income from this illicit trade. On two occasions, he had seen Amelia P. purchase cocaine. One of these transactions had occurred in the parking lot of an apartment complex in Quartz Hill. The other transaction had occurred on March 4 or 5, 1986, at a house belonging to Thomas's mother. According to defendant, Amelia P. had announced at the door that she had come "to see Miss Thomas about some coke." Defendant had invited Amelia inside. Amelia had asked Thomas's mother to "front her an eight track of cocaine." (Defendant testified that an "eight track" is one-eighth of an ounce.) After some discussion of arrangements for payment, Thomas's mother had given cocaine to Amelia. On a later date, defendant had seen Amelia P. at a market and they had waved to each other but had not conversed.

On the morning of March 21, defendant was driving his mother's car to a friend's house when he noticed Amelia P. standing in the front yard of her residence. She was wearing a housecoat or robe. It was about 9 a.m. When he blew the horn, she came to the car and asked how he had been and if he knew anybody who had any cocaine. Defendant said he had some. She asked if she could have it on credit as a favor. He said that it would depend on whether she would do him a favor. They agreed to talk about it further.

Defendant drove to the camper, retrieved some cocaine, and returned to the victim's residence. Amelia P. invited him into the house. He sold her

---

[2]The information did not charge rape or the rape-murder special circumstance, but the jury was instructed on first degree felony murder in the course of rape. According to the prosecutor, the evidence at the preliminary hearing was insufficient to support a charge of rape, and therefore the information did not charge rape expressly. Only after the preliminary hearing did the prosecution complete the laboratory work excluding Gregory and the victim's husband, but not defendant, as the source of the semen found on the victim.

some cocaine on credit for $50. (Sheriff's officers did not find rock cocaine at the victim's residence, but they did find an empty "baggie" in the garage. Just two and one-half inches square, the baggie was smaller than the ones normally sold in supermarkets; it was a convenient size for $50 worth of rock cocaine. The officers did not take possession of the baggie.)

Defendant smoked some cocaine, then asked Amelia P. when she could pay him. After further conversation, Amelia agreed to have sex with defendant in lieu of cash payment. They engaged in sexual intercourse on the living room couch; defendant left five minutes later. Defendant did not see anyone else in the house. He went back to the camper and told Gregory he had had sex with Amelia P. in exchange for cocaine. Defendant then went jogging. He did not wear the MacGregor shoes, which had cleats, but athletic shoes with smooth soles. When he returned to the camper, Gregory was there and their mother arrived about five minutes later.

Defendant changed to work boots. Gregory and defendant went with their mother to the post office, and then to Julia Watson's house. Defendant sat in the front passenger seat of his mother's automobile during this excursion.

At that time, defendant had tattoos on both biceps, on his right shoulder, and on his lower left arm. Defendant denied owning the cut-offs found in the camper and denied knowing to whom they belonged, although he admitted he had seen them in the camper. Defendant admitted owning the survival knife found in the camper. Gregory is two years younger than defendant and had no facial hair on the day of the murder. (Apparently, a photograph in evidence, taken on the day of the murder after defendant's arrest, showed that defendant had a goatee and/or a mustache.)

To establish Gregory's knowledge of the details of the murder, the defense introduced the complete tape recordings of Gregory's two interviews with investigating officers. During these interviews, Gregory said that when defendant saw the officers following his tracks to the camper, he admitted to Gregory that it appeared the officers were following his (i.e., defendant's) tracks.

According to Gregory, defendant gave this description of what he had done: Defendant had hidden and the woman had walked up with a basket of clothes. The woman was wearing a housecoat, which came open. Defendant rushed up, grabbed her, put a knife to her throat, and said he wanted only money. The woman had no money and no jewelry, but defendant took a couple of shotguns, one of which looked like a rifle. The woman started to make a lot of noise, so defendant put a sock in her mouth. There was a little boy, and there was a boa constrictor in an aquarium. (Kevin kept a pet snake

in his bedroom.) The little boy had shown defendant where to find the keys to a van. Defendant had started the van but was unable to drive it out of the garage because the garage door was padlocked on the outside. Defendant had "hogtied" the woman with some neckties that were in the closet "next to a . . . jacket with all kinds of medals on it—something like a Ranger jacket or something." (Ubaldo P. testified he had been an Airborne Ranger in the United States Army, and his green full-dress uniform had been hanging in the closet.) Defendant became "real nervous" because the woman had said her husband would come home at noon and it was then 11:25 a.m. He had tied her up to give himself enough time to get away. He did not rape the woman. According to Gregory, defendant said nothing about hitting the woman.

By stipulation, the defense established, first, that Kevin had told investigating officers on the day of the murder that he had been watching a certain television program when the intruder entered his house; second, that this program had been broadcast that day from 10:30 to 11:00 a.m.; and, third, that the professional baseball game that was broadcast that morning began at 10:30 a.m.

An expert in drug dependency testified that it is frequently impossible to determine from an individual's appearance and behavior whether that individual has been using cocaine. He also testified that it is not uncommon for the spouse of a cocaine addict to profess ignorance of the addict's use of cocaine. This may indicate genuine ignorance or the psychological state of denial.

A defense investigator testified that he had driven the route that defendant said in his testimony that he had jogged on the morning of the murder and that the distance was three miles.

### 3. *Rebuttal*

On rebuttal, Deputy Sheriff Robert Flores testified that on March 21, 1986, the time from the landing of the sheriff's helicopter at the victim's residence to the officers' arrival at the Cudjo camper was at least one hour and thirty minutes.

### B. *Penalty Phase*

The prosecution presented no evidence at the penalty phase. The only defense evidence was the testimony of defendant. Asked but a single question, defendant again denied killing Amelia P. There was no cross-examination.

## II. Guilt Phase Errors

### A. *Exclusion of Evidence of Gregory Cudjo's Confession*

 Defendant contends that the trial court erred in excluding evidence that Gregory had confessed to the murder of Amelia P. We agree that the ruling was erroneous, but we conclude that defendant was not thereby prejudiced.

### 1. *Proceedings in the trial court*

The prosecution had intended to call Gregory Cudjo as a witness during its case-in-chief, but the trial court determined that Gregory was unavailable as a witness (see Evid. Code, § 240) after Gregory asserted his privilege against self-incrimination during a nonjury hearing. The prosecution then introduced the testimony Gregory had given at defendant's preliminary hearing.

During the defense case, defense counsel represented to the trial court that John Lee Culver was prepared to testify that Gregory Cudjo had admitted responsibility for the murder of Amelia P. while Culver and Gregory were incarcerated together at the Antelope Valley sheriff's substation. The prosecutor remarked that the trial court would have to rule on the admissibility of the proposed testimony both as a statement against penal interest and under Evidence Code section 352.[3] To permit the trial court to make the necessary determinations of preliminary fact (see Evid. Code, § 402), Culver then testified out of the jury's presence, to the following effect.

When not incarcerated, Culver lived in Littlerock. He had known defendant for approximately 15 to 20 years. He also knew defendant's mother, his sisters, and his brother Gregory. In March 1986, Culver was in custody at the Antelope Valley sheriff's substation, where he shared a cell with Gregory Cudjo. Because of Gregory's restless pacing, Culver asked what was wrong. Gregory answered, "Man, they got me in here for a murder" and "I need [to] talk to somebody." As Culver put it, Gregory then "started talking about why he'd done it and what he'd done . . . ." According to Culver, Gregory said, "I went over to rob, burglarize this lady's house and she seen me and then that's when all the stuff went down and that's what happened."

Gregory then explained, in Culver's words, that he "went in the house and this woman supposed to have been washing clothes, and she caught him

---

[3] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

coming in the house . . . . When the woman seen him he just started beating the woman up and then she started screaming, so he knocked her out and went and done it again, kept hitting her, kept hitting her . . . . He kept banging her around in the head." Gregory reportedly said that the woman started screaming as soon as she saw him, that he "knocked her out," that she "came back to," and that he "started hitting her and hitting her with a hammer or whatever he hit her with." Gregory also said, reportedly, that he had found jewelry and guns in the house, and that he knew the lady because they had "smoked dope together." Gregory did not mention raping the woman.

On cross-examination, the prosecutor asked Culver if Gregory had mentioned anyone besides the woman being present in the house. Culver answered that at the time Gregory had not mentioned anyone else, but that Culver had talked to Gregory shortly before Culver's testimony and that through this conversation Culver had learned that there "probably was a little boy or somebody in the house."

According to Culver, Gregory had been taken from the cell he shared with Culver. When Gregory returned, he told Culver that detectives had interviewed him about the murder. Asked whether Gregory had admitted inculpating defendant for the murder, Culver at first said that Gregory had done so, but he immediately changed his testimony, stating that he merely inferred that Gregory had blamed defendant because Gregory was released shortly thereafter and because defendant's criminal record was worse than Gregory's.[4] Culver testified that he first became aware of defendant's presence at the substation two days after his conversation with Gregory, when Culver was being taken to court. At that time, Culver told defendant nothing about Gregory's confession, even after defendant said he was incarcerated for murder. Culver said he first spoke of the confession approximately three months before his testimony, when he was contacted and interviewed by a defense investigator.

Following Culver's testimony, the trial court invited argument. The prosecutor asserted that Culver's demeanor, background, and relationship to the

---

[4]"Q. So did he tell you he copped out on his brother?

"A. Yeah, he said he told that he didn't do it, he said that his brother done it.

"Q. So, now you're saying that he did say he copped out on his brother?

"A. Well, that it seemed like, because as soon as he got out of the holding tank to go into the court, he gets out, so he had to cop out, anybody can see through that.

"Q. Okay, so what you're saying is that you formed the opinion that Gregory had copped out instead of Gregory telling you that he had copped out.

"A. I formed the opinion that Gregory told the police that his brother had done it because . . . [defendant's] record looks worser than Gregory['s]. Automatically they're going to keep the man that got the worstest record and let the man that don't have the worstest record go."

defendant, as well as the content of his testimony, made him unworthy of belief. The prosecutor framed the question as "whether or not we should allow a liar to testify in front of the jury just for the purpose of propping up a straw man." The prosecutor urged the court to exclude Culver's testimony under Evidence Code section 352 as inherently incredible.

The court inquired whether it would then be "making a judgment as trier of fact and taking it away from the jury." The prosecutor said that Evidence Code section 352 required this on some occasions. The court agreed it must "resolve" issues such as Culver's friendship with defendant and the fact that Culver waited so long to come forward; "[t]hese are the things that I consider."

Defense counsel maintained that the evidence was admissible as a declaration against penal interest under Evidence Code section 1230. The trial court agreed with defense counsel that Gregory was unavailable as a witness because he had exercised his privilege against self-incrimination and that the statements attributed to him by Culver were against his penal interest.

However, the court found that "to allow this testimony would be a travesty of justice . . . ." Concluding that the evidence lacked "indicia of reliability," the court ruled that it was not admissible as a declaration against interest. In support of the ruling, the court cited Evidence Code section 1230 and *People* v. *Martin* (1983) 150 Cal.App.3d 148, 162 [197 Cal.Rptr. 655].

Later that day, after another defense witness had testified before the jury, the trial court added that "in interpreting section 1230 of the Evidence Code" it had also relied upon *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 878-881 [123 Cal.Rptr. 862]. Later still, during a hearing on defendant's motion for a new trial, the court stated "for the record" that it had found Culver's testimony "unreliable and untrustworthy" and had concluded that the probative value of the evidence "was outweighed by prejudice under section 352 of the Evidence Code within the meaning of *People* versus *Green*, 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]."

2. *Evidence Code section 1230*

Under one of the statutory exceptions to the hearsay rule, a party may introduce in evidence, for the truth of the matter stated, an out-of-court statement by a declarant who is unavailable as a witness at trial if the

statement, when made, was against the declarant's penal, pecuniary, proprietary, or social interest.[5] ■ A party who maintains that an out-of-court statement is admissible under this exception as a declaration against *penal interest* must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 745 [280 Cal.Rptr. 440, 808 P.2d 1197].) To determine whether the declaration passes the required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." (*Ibid.*) On appeal, the trial court's determination on this issue is reviewed for abuse of discretion. (*Ibid.*)

■ Here, Gregory Cudjo was unavailable as a witness because he had chosen to exercise his privilege against self-incrimination. (*People* v. *Leach* (1975) 15 Cal.3d 419, 438 [124 Cal.Rptr. 752, 541 P.2d 296].) It is likewise not disputed or reasonably disputable that a statement confessing to a killing during the course of a burglary and robbery, as attributed to Gregory in Culver's testimony, subjects the declarant to a risk of criminal liability and therefore on its face is against the alleged declarant's penal interest.

Moreover, given the circumstances of Gregory's alleged statement, the trial court had discretion to conclude that it was admissible despite its hearsay character because, if made as claimed, it was probably true. By Culver's account, Gregory made his statement spontaneously, while alone with an acquaintance, within hours after a murder for which Gregory, who had no alibi, was in custody as a prime suspect. Gregory tended to fit Kevin P.'s description of the assailant, and much of the other evidence, in particular the incriminating shoe prints, was as consistent with Gregory's guilt as with defendant's.

It is true, as the People suggest, that the alleged statement was inconsistent to some extent with the physical evidence, most notably the evidence that the victim was hog-tied before she was beaten to death. However, such discrepancies might be attributable to Gregory's agitation or Culver's misunderstanding of what he was told. They did not negate all possibility that if

---

[5]"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected [the declarant] to the risk of civil or criminal liability, or so far tended to render invalid a claim by [the declarant] against another, or created such a risk of making [the declarant] an object of hatred, ridicule, or social disgrace in the community, that a reasonable [person] in [the declarant's] position would not have made the statement unless [the person] believed it to be true." (Evid. Code, § 1230.)

Gregory claimed to be the murderer, he was telling the truth. Hence, the court could properly have found that "a reasonable [person] in [Gregory's] position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

But the trial court did not focus exclusively, or even primarily, on whether Gregory's *hearsay statement* might be false. Instead, the court apparently accepted the prosecution's contention that *Culver* was probably a liar who should therefore be excluded as a *live witness*. In so doing, the court erred.

The People argue that in considering the admissibility of evidence offered under the hearsay exception for declarations against interest, the trial court could properly consider the credibility of the in-court witness, Culver. We disagree. The credibility of the in-court witness is not a proper consideration in this context.

■ Hearsay is generally excluded because the out-of-court declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor. (See *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 298 [35 L.Ed.2d 297, 310-311, 93 S.Ct. 1038]; *People* v. *Bob* (1946) 29 Cal.2d 321, 325 [175 P.2d 12].) Because the rule excluding hearsay is based on these particular difficulties in assessing the credibility of statements made outside the jury's presence, the focus of the rule's several exceptions is also on the reliability of the out-of-court declaration. Thus, the various hearsay exceptions generally reflect situations in which circumstances affording some assurance of trustworthiness compensate for the absence of the oath, cross-examination, and jury observation. (*Chambers* v. *Mississippi, supra,* 410 U.S. at pp. 298-299 [35 L.Ed.2d at pp. 310-311].) Neither the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury.

■ When evidence is offered under one of the hearsay exceptions, the trial court must determine, as preliminary facts, both that the out-of-court declarant made the statement as represented, and that the statement meets certain standards of trustworthiness. (See legis. committee com., 29B West's Ann. Evid. Code (1966 ed.) § 403, p. 268.) The first determination—whether the declaration was made as represented—is governed by the substantial evidence rule. The trial court is to determine only whether there is evidence sufficient to sustain a finding that the statement was made. (*Ibid.*) As with other facts, the direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent "without resorting to inferences or deductions." (*People* v. *Huston* (1943) 21

Cal.2d 690, 693 [134 P.2d 758]; accord, *People* v. *Jones* (1990) 51 Cal.3d 294, 314-316 [270 Cal.Rptr. 611, 792 P.2d 643]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].) Except in these rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence under the hearsay exception for statements against penal interest. (See *U.S.* v. *Seeley* (1st Cir. 1989) 892 F.2d 1, 3; Comment, *Statements Against Penal Interest* (1978) 66 Cal.L.Rev. 1189, 1205, fn. 99; Note, *Declarations Against Penal Interest* (1976) 56 B.U.L. Rev. 148, 178-179; 2 McCormick on Evidence (4th ed. 1992) § 318, p. 342, fn. 10.)

### 3. *Evidence Code section 352*

█ When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 688 [248 Cal.Rptr. 69, 755 P.2d 253].) On appeal, the ruling is reviewed for abuse of discretion. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 973 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

█ Here, no claim is made that permitting Culver to testify would have taken an undue amount of time. Culver's testimony out of the jury's presence, including a thorough cross-examination, did not take long, and the prosecutor did not represent that rebuttal witnesses would be required.

Nor is there any apparent danger of confusion of the issues. Culver's testimony would not even have introduced the issue of Gregory's possible culpability for the murder of Amelia P. The issue was already there, as defense counsel had made clear from the outset of trial; Gregory's culpability constituted the primary defense. (See *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1310, fn. 15 [283 Cal.Rptr. 382, 812 P.2d 563].)

The evidence had substantial probative value. █ To withstand a challenge under Evidence Code section 352, evidence of a third party's culpability "need only be capable of raising a reasonable doubt of [the] defendant's guilt." (*People* v. *Hall* (1986) 41 Cal.3d 826, 833 [283 Cal.Rptr. 382, 812 P.2d 563].) █ Here, Culver would testify that Gregory, the other prime suspect in the case, had confessed to the murder within hours after the crime was committed and under circumstances providing substantial assurances that the confession was trustworthy. The issue of Gregory's

guilt was highly material: given Kevin P.'s testimony describing a single intruder, and given also the single set of shoe prints leading away from the victim's residence, proof of Gregory's guilt would exonerate defendant. Thus, Culver's testimony raised the requisite reasonable doubt of defendant's guilt.

Finally, the evidence was highly necessary: although there was other evidence tending to cast suspicion on Gregory, there was no comparable direct evidence of Gregory's guilt. Gregory's decision to exercise his privilege against self-incrimination precluded the defense from calling Gregory as a witness.

Nor was there any danger of "undue prejudice" to the prosecution. The evidence was not likely "to arouse the emotions of the jurors" or "to be used in some manner unrelated to the issue on which it was admissible." (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1016 [254 Cal.Rptr. 586, 766 P.2d 1]; see also, *People* v. *Farmer* (1989) 47 Cal.3d 888, 912 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].)

As noted, the trial court apparently concluded that the evidence was more prejudicial than probative because Culver was not a credible witness. However, such doubts, however legitimate, do not constitute "prejudice" under Evidence Code section 352. (See *People* v. *Alcala* (1992) 4 Cal.4th 742, 791 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) We have warned trial courts to avoid hasty conclusions that third-party-culpability evidence is "incredible"; this determination, we have affirmed, "is properly the province of the jury." (*People* v. *Hall, supra*, 41 Cal.3d at p. 834.) Unlike other cases in which similar evidence was excluded for lack of credibility (e.g., *People* v. *Blankenship* (1985) 167 Cal.App.3d 840, 849 [213 Cal.Rptr. 666]; *People* v. *Martin, supra*, 150 Cal.App.3d 148, 162; *People* v. *Chapman, supra*, 50 Cal.App.3d 872, 878), nothing in the record indicates that Culver's testimony was motivated by threats or bribery or expectation of personal advantage.

We conclude that doubts about Culver's credibility, though reasonable and legitimate, did not provide a sufficient basis to exclude his testimony. In sustaining the prosecutor's objection to this evidence, the trial court abused its discretion.

4. *Constitutional claims; standard of prejudice*

Defendant urges that the trial court's exclusion of Culver's testimony usurped his federal due process and fair trial rights. In essence, defendant

complains he was unconstitutionally deprived of the right to present a defense. Hence, he reasons, the prejudicial effect of the error must be measured under the constitutional standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065] (reversal required unless error harmless beyond reasonable doubt).

■ We find no constitutional violation. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.] . . . [T]his principle applies perforce to evidence of third-party culpability . . . ." (*People* v. *Hall, supra,* 41 Cal.3d 826, 834-835.)

It follows, for the most part, that the mere erroneous exercise of discretion under such "normal" rules does not implicate the federal Constitution. Even in capital cases, we have consistently assumed that when a trial court misapplies Evidence Code section 352 to exclude defense evidence, including third-party-culpability evidence, the applicable standard of prejudice is that for state law error, as set forth in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (error harmless if it does not appear reasonably probable verdict was affected). (E.g., *People* v. *Alcala, supra,* 4 Cal.4th 742, 791; *People* v. *Babbitt, supra,* 45 Cal.3d 660, 688; *People* v. *Hall, supra,* 41 Cal.3d at p. 836; *People* v. *Wright* (1985) 39 Cal.3d 576, 585-586 [217 Cal.Rptr. 212, 703 P.2d 1106].)

Justice Kennard, in her dissent, urges that by barring a crucial defense witness as "incredible," the trial court unconstitutionally invaded the jury's function and denied defendant his right, under the compulsory process clause of the Sixth Amendment, to present witnesses in his behalf. The United States Supreme Court has held that the constitutional right to present and confront material witnesses may be infringed by *general rules* of evidence or procedure which preclude material testimony or pertinent cross-examination for arbitrary reasons, such as unwarranted and overbroad assumptions of untrustworthiness. However, the high court has never suggested that a trial court commits constitutional error whenever it individually assesses and rejects a material defense witness as incredible. (See, e.g., *Michigan* v. *Lucas* (1991) 500 U.S. 145 [114 L.Ed.2d 205, 111 S.Ct. 1743] [preclusive effect of statutory notice-of-evidence requirement in rape case]; *Taylor* v. *Illinois* (1988) 484 U.S. 400 [98 L.Ed.2d 798, 108 S.Ct. 646] [sanction of preclusion for defense violation of discovery rules]; *Rock* v. *Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704] [exclusion of accused's own testimony under state rule disallowing all hypnotically refreshed evidence]; *Green* v.

*Georgia* (1979) 442 U.S. 95 [60 L.Ed.2d 738, 99 S.Ct. 2150] [absolute state failure to recognize hearsay exception for declarations against penal interest]; *Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105] [denial of cross-examination for bias based on state rule making evidence of juvenile proceedings inadmissible in adult court]; *Chambers* v. *Mississippi*, *supra*, 410 U.S. 284 [state rule precluding cross-examination of party's own witness]; *Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920] [state rule precluding accomplice from testifying for defense]; but cf. *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674, 106 S.Ct. 1431] [preclusion of cross-examination for bias, based upon individual assessment of probative value against prejudice, violated confrontation clause].)

■ We reiterate that in general under California law, the credibility of individual witnesses "is properly the province of the jury." (*Hall*, *supra*, 41 Cal.3d at p. 834.) Nonetheless, absent clearer guidance from above, we will not lightly assume that a trial court invites federal constitutional scrutiny each and every time it decides, on the basis of the particular circumstances, to exclude a defense witness as unworthy of credit. We decline to extend the federal decisions in the manner proposed by defendant and in Justice Kennard's dissent. We conclude that the *Watson* standard of prejudice applies to the trial court's mistake.

### 5. *Prejudice*

■ Applying the *Watson* standard, we conclude that exclusion of Culver's testimony, though erroneous, was harmless because it is not reasonably probable that admission of the testimony would have affected the outcome. We recognize that Gregory was the other prime suspect in the murder, and he disclosed accurate crime-scene details, which he told the police defendant had revealed to him. Moreover, Kevin P., the only eyewitness, never identified the assailant and gave a description which more closely resembled Gregory than defendant. Some other evidence was consistent with Gregory's guilt as well as defendant's. Yet the inference that defendant, not Gregory, was the murderer was extremely strong.

Trapped by a semen sample that included defendant but excluded all other known potential donors, including Gregory, defendant was forced to admit that he was present at the crime scene on the morning of the murder, and that he had sex with the victim. The physical evidence, in particular the shoe prints leading to and from the victim's home, strongly suggested there had been only one visitor during that morning. Just as important, Kevin described only one entry, by the man who robbed his mother.

By contrast, defendant's uncorroborated effort to provide an innocent explanation for his presence in the victim's house was not convincing. Defendant testified he had encountered the victim purchasing cocaine on two prior occasions, and that she traded cocaine for sex on the day of the murder. However, these claims contravened all other evidence about the victim's life-style and values.

The victim's husband testified that she never exhibited signs of drug use during a 13-year marriage, and there was no cocaine in her blood at the time of her death. Moreover, the victim's family was on a tight budget and managed its money carefully; the victim's husband noticed no unusual withdrawals from the family account.

It also seems unlikely that the victim, a housewife and mother, would have engaged in casual sex and drug activity in her living room with a near stranger while her five-year-old son was at home. Defendant's version of events failed to mention or explain Kevin's presence during the alleged sex-for-drugs encounter. The implausibility of defendant's account enhanced the inference that he was involved in the homicide.

Finally, as the trial court surmised, both Culver's testimony and the hearsay confession it recounted had obvious indicia of unreliability. Though he knew the entire Cudjo family, Culver was a particular friend of defendant and thus had a motive to lie. Moreover, Gregory's purported jailhouse confession contravened both the physical evidence and all other accounts Gregory had given, including his testimony under oath at the preliminary hearing.

According to Culver, Gregory said that as he was entering the victim's home to burglarize it, the victim came upon him by surprise, whereupon he "tripped" and immediately began beating her with a hammer. As previously noted, however, the crime-scene evidence made clear that the victim was carefully hog-tied in her bedroom before she was beaten and killed. When asked whether Gregory had mentioned anybody else in the house, Culver admitted that Gregory had originally failed to account for this crucial detail. However, Culver claimed that in a courthouse conversation just minutes before Culver took the stand, Gregory belatedly mentioned that there "probably was a little boy or somebody . . . ." This claim is suspect. It strains common sense that Gregory willingly provided additional details to Culver at a moment when he must have known Culver was about to give incriminating testimony against him.

In all his other known statements and sworn testimony, Gregory insisted he had no involvement in the homicide. Moreover, after observing Culver's

demeanor and hearing his testimony, the trial court concluded that Culver was a patently incredible witness. Under all these circumstances, the chance that a competent jury would have given Culver's testimony substantial weight seems remote. Accordingly, it is not reasonably probable that admission of his testimony would have affected the outcome. No basis for reversal appears.

## B. *Admission of Gregory Cudjo's Preliminary Hearing Testimony*

The prosecution had intended to call Gregory Cudjo as a witness during the case-in-chief. Because Gregory was a potential suspect in the murder of Amelia P., the trial court appointed counsel to advise him. After conferring with counsel, Gregory decided to assert his privilege against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) and to refuse to answer any questions relating to the murder. The prosecution then announced its intention to offer in evidence, under the former testimony exception to the hearsay rule (see Evid. Code, §§ 1200, 1291), the testimony Gregory had given at the preliminary hearing. After Gregory had asserted his privilege against self-incrimination during a nonjury hearing, the trial court found that Gregory was unavailable as a witness (*id.*, § 240), and it overruled the defense objection to Gregory's former testimony. When proceedings with the jury resumed, the transcript of Gregory's preliminary hearing testimony was read aloud.

Here is what the transcript revealed:

Called as a prosecution witness at the preliminary hearing, Gregory had at first testified that on the morning of Amelia P.'s murder, and throughout that day, defendant had worn long pants and boots; that defendant had remained in the camper with Gregory from the time Gregory awoke, between 9:30 and 10 a.m., until their mother arrived and the three of them went together to the house of Julia Watson; and that Gregory had not seen defendant washing his tennis shoes at Watson's house. Under further questioning, including references to his previous interviews with sheriff's investigators, Gregory had testified that he could not be sure that defendant had remained in the camper during the late morning hours because he (Gregory) had fallen asleep again for most of this time, and that defendant had later told Gregory he had been jogging that morning. But Gregory denied that he had ever told sheriff's investigators that he had seen defendant leave the camper that morning, that defendant had been wearing cut-off jeans and tennis shoes, or that defendant had later washed his shoes at Watson's house.

Without objection, the prosecutor at the preliminary hearing had then played part of a tape recording of two sheriff's investigators interviewing

Gregory on the day following the murder. During the portion of the taped interview that was played, Gregory had said that defendant had been gone from the camper for two hours on the morning of the murder, that defendant had worn cut-off jeans and white tennis shoes that morning, that at Watson's house defendant had taken off his tennis shoes and washed them, and that defendant had later changed into long pants and boots. After the tape had been played, Gregory had testified that he remembered the conversation with the sheriff's investigators, that hearing the tape had refreshed his recollection, that he had not lied to the investigators and had told them what he knew, and that he did not disagree with any of the things he had told the officers.

Defendant now contends: (1) his trial counsel was ineffective for failing to object at the preliminary hearing to the playing of the tape recording of the interview; (2) his trial counsel was ineffective for failing to request a jury instruction that Gregory's taped statements could not be considered for the truth of the matters asserted; (3) the trial court erred in finding Gregory unavailable as a witness; (4) admission of Gregory's preliminary hearing testimony denied defendant his right of confrontation; (5) the prosecutor's failure to grant immunity to Gregory violated various constitutional rights of defendant; and (6) the trial court should have told the jurors why Gregory was not appearing before them to testify.

## 1. *Ineffective assistance at preliminary hearing*

■ A criminal defendant has a constitutional right to the assistance of counsel (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15). This right to counsel extends to every critical stage of the proceeding, including the preliminary hearing. (*Coleman* v. *Alabama* (1970) 399 U.S. 1, 9-10 [26 L.Ed.2d 387, 396-397, 90 S.Ct. 1999] (lead opn. of Brennan, J.); *id.* at p. 11 [26 L.Ed.2d at pp. 397-398] (conc. opn. of Black, J.).) The right comprehends more than just the formality of representation by a lawyer; it entitles the defendant to competent and effective legal assistance. (*United States* v. *Cronic* (1984) 466 U.S. 648, 654-655 [80 L.Ed.2d 657, 664-666, 104 S.Ct. 2039]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839].)

■ A claim of ineffective assistance of counsel is evaluated by well-established standards. A defendant seeking relief on the basis of ineffective assistance must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].)

616

██ Here, defendant has failed to show that a reasonably competent attorney, acting as a diligent advocate, would have objected at the preliminary hearing to introduction of evidence of the taped interview with Gregory. Although hearsay (Evid. Code, § 1200), the evidence was admissible under the hearsay rule exceptions for inconsistent statements (*id.*, § 1235) and past recollection recorded (*id.*, § 1237). Because there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance.

### 2. *Ineffective assistance at trial*

██ Defendant faults his trial counsel for not asking the trial court to instruct the jury that Gregory's taped statements could not be considered for the truth of the matters asserted. He relies on the Law Revision Commission's comment to Evidence Code section 1202, stating that although Evidence Code section 1235 permits a finder of fact to consider a *trial witness's* inconsistent statement for the truth of the matter stated, no similar hearsay exception applies to the inconsistent statements of a *hearsay declarant*. (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1979 ed.) § 1202, p. 62.)

What defendant's argument overlooks is that after his taped statements were played at the preliminary hearing, Gregory testified that the tape had refreshed his recollection, that he had not lied to the investigators and had told them what he knew, and that he did not disagree with any of the things he had told the officers. Because Gregory in this way adopted and reaffirmed the substance of his statements to the officers, the jury was entitled to consider those statements for their truth under Evidence Code section 1291 as part of Gregory's former testimony. An instruction correctly explaining this situation to the jury would not have benefited the defense.

### 3. *Gregory's unavailability as a witness*

██ A person is unavailable as a witness if the person is "[e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant." (Evid. Code, § 240, subd. (a)(1).) One such privilege, the exercise of which makes a person unavailable as a witness, is the constitutional privilege against self-incrimination. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251 [270 Cal.Rptr. 451, 792 P.2d 251].) To be found unavailable on this ground, a witness must not only intend to assert the privilege, but also be entitled to assert it. (*People* v. *Ford* (1988) 45 Cal.3d 431, 440-441 [247 Cal.Rptr. 121, 754 P.2d 168, 76 A.L.R.4th 785].)

██ Here, Gregory demonstrated his intention to assert the privilege when he was called to testify during a foundational hearing out of the jury's

presence. After Gregory was sworn, the prosecutor asked whether Gregory intended to answer any questions about the murder of Amelia P., and whether he had conversed with defendant about a crime defendant had committed near the Cudjo camper on the day of the murder. Gregory refused to answer each question, expressly grounding his refusal on the privilege against self-incrimination. Defense counsel then stipulated that Gregory would assert the privilege "as to any testimony he may give in this matter."

Defendant argues that even though Gregory intended to assert the privilege, Gregory did not sufficiently establish that he was entitled to do so. We disagree.

To invoke the privilege, a witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers "would furnish a link in the chain of evidence needed to prosecute" the witness for a criminal offense. (*Hoffman* v. *United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 1123-1124, 71 S.Ct. 814]; see also *People* v. *Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388].) To satisfy this standard, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Hoffman* v. *United States, supra,* at pp. 486-487 [95 L.Ed.2d at pp. 1123-1124].) Consistent with these principles, our Evidence Code provides that when a witness grounds a refusal to testify on the privilege against self-incrimination, a trial court may compel the witness to answer only if it "clearly appears to the court" that the proposed testimony "cannot possibly have a tendency to incriminate the person claiming the privilege." (Evid. Code, § 404.)

Here, it did not "clearly appear" that Gregory's proposed testimony could not have tended to incriminate him for the murder of Amelia P. Gregory had been taken into custody as a suspect in that offense. Indeed, defendant has argued, both at trial and on this appeal, that the evidence is entirely consistent with the hypothesis that Gregory, rather than defendant, killed Amelia P. Answers to the prosecution's questions about Gregory's observations on the day of the murder, and Gregory's conversations with defendant relating to the murder, could have developed evidence tending to establish Gregory's own complicity in the victim's death. (See *People* v. *Sipress* (1975) 51 Cal.App.3d 98, 102 [123 Cal.Rptr. 884]; *People* v. *Traylor* (1972) 23 Cal.App.3d 323, 330 [100 Cal.Rptr. 116].) Moreover, because Gregory had testified at the preliminary hearing, he could properly invoke the privilege to avoid exposing himself to a charge of perjury in that proceeding. (*People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 570-571 [156

Cal.Rptr. 630].) The trial court did not err in finding Gregory unavailable as a witness on the ground of privilege.

### 4. *The right of confrontation*

 Both the state and federal Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation is not absolute, however; in particular, it does not preclude the prosecution from proving its case through the prior testimony of a witness who is unavailable at trial, so long as the defendant had the right and the opportunity to cross-examine the witness during the earlier proceeding at which the witness gave this testimony. (*Barber* v. *Page* (1968) 390 U.S. 719, 722 [20 L.Ed.2d 255, 258-259, 88 S.Ct. 1318]; *People* v. *Alcala, supra,* 4 Cal.4th 742, 784-785.)

 Here, defendant maintains that his right of confrontation was denied by the prosecution's use of Gregory's preliminary hearing testimony. Although his attorney did cross-examine Gregory at the preliminary hearing, defendant maintains that he did not have a fair opportunity to cross-examine because Gregory's ability to think and respond coherently had been impaired by the ingestion of some drug or drugs.

The record before us does not support defendant's contention. During the preliminary hearing, Gregory's competence as a witness was not challenged. Gregory was not asked at the preliminary hearing whether he had taken drugs, and no evidence on that subject was introduced at the preliminary hearing. Although at trial defense counsel voiced his opinion that Gregory had been under the influence of drugs at the time of his preliminary hearing, he provided no evidence to support the claim. Even if we assume that Gregory had ingested some drug, moreover, it does not appear that Gregory's mental functioning was so impaired as to preclude meaningful cross-examination. Gregory's testimony at the preliminary hearing was lucid and responsive to the questions asked. Although his testimony was internally inconsistent, this does not appear to have been the result of inability on his part to comprehend the questions or to understand his duty as a witness to tell the truth. Rather, it appears that Gregory was reluctant to give evidence damaging to defendant and did so only under the pressure of the prosecutor's examination and after listening to the tape recording of his prior interview. The failure of defense counsel to cross-examine more vigorously may be explained as a tactical decision. Gregory had already impeached himself by giving contradictory testimony, and further probing could have resulted in testimony more damaging to defendant. The trial court did not err, therefore, in concluding that defendant had a fair opportunity to cross-examine Gregory at the preliminary hearing. Defendant has not established a violation of his right of confrontation.

### 5. *Failure to grant immunity*

■ Defendant contends that by not granting immunity to Gregory, and thereby removing the self-incrimination barrier to Gregory's testimony at defendant's trial, the prosecution violated defendant's constitutional right of confrontation and denied him due process of law. (U.S. Const., 5th, 6th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)

At no time during proceedings in the trial court did the defense request immunity for Gregory, nor did the defense make an offer of proof as to Gregory's testimony. Because the issue of immunity was not raised at trial, it is not preserved for review on appeal. (*People* v. *Sutter* (1982) 134 Cal.App.3d 806, 813 [184 Cal.Rptr. 829]; *People* v. *Sipress, supra,* 51 Cal.App.3d 98, 102.) Moreover, there is no authority in this state for the proposition that a prosecutor must request or the trial court must grant immunity to a witness on the ground that the witness's testimony could be favorable to the defense. (See *People* v. *Hunter* (1989) 49 Cal.3d 957, 973 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Jackson* (1986) 178 Cal.App.3d 694, 700 [224 Cal.Rptr. 37]; *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835, 841 [189 Cal.Rptr. 814].) In *Hunter, supra,* we assumed without deciding that in appropriate circumstances judicially conferred use immunity might be necessary "to vindicate a criminal defendant's rights to compulsory process and a fair trial[.]" (*Hunter, supra,* at p. 974.) But we also said that such immunity would be required only if the witness's testimony was both clearly exculpatory and essential to an effective defense, and if no strong governmental interest weighed against the grant of immunity. (*Ibid.*) Here, defendant has not demonstrated that Gregory's testimony would have been clearly exculpatory or that it would have differed from his preliminary hearing testimony. And, because the issue was never raised at trial, the record is inadequate to determine whether a strong governmental interest would have weighed against a grant of immunity. Thus, defendant has failed to demonstrate the existence of circumstances in which a trial court might be required to confer use immunity to ensure a fair trial.

### 6. *Failure to inform the jury*

■ Defendant contends that the trial court should have either informed the jury of Gregory's refusal to testify or compelled Gregory to claim the privilege against self-incrimination in the jury's presence. We reject this contention. As we have explained in previous opinions, permitting the jury to learn that a witness has invoked the privilege against self-incrimination serves no legitimate purpose and may cause the jury to draw an improper inference of the witness's guilt or complicity in the charged offense. (*People*

v. *Hill* (1992) 3 Cal.4th 959, 992 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People* v. *Mincey, supra*, 2 Cal.4th 408, 441; *People* v. *Frierson, supra*, 53 Cal.3d 730, 743.)

C. *Failure to Grant Immunity to Defense Witness Mitchell*

The defense had James Mitchell, a state prison inmate, brought to court to testify in defendant's trial. At defense counsel's suggestion, the court appointed an attorney to advise Mitchell. After conferring with counsel, Mitchell decided not to testify and, instead, to exercise his privilege against self-incrimination, unless he received immunity. Mitchell's counsel conveyed this decision to the prosecutor. At a hearing held outside the jury's presence, the prosecutor announced that he would not request immunity for Mitchell, noting that he did not even know the subject of Mitchell's proposed testimony. Defense counsel offered to provide this information, but the prosecutor said it would make no difference to his decision. The trial court stated that it could not compel the prosecutor to request immunity. Defense counsel then said there was no point in calling Mitchell to the stand, even out of the jury's presence, when it was apparent that he would refuse to testify. The defense did not ask the court to grant immunity, nor did the defense make an offer of proof as to the testimony Mitchell would have given had he received immunity.

Based on these facts, defendant contends: (1) the prosecutor improperly failed to request immunity for Mitchell; (2) the trial court erred in failing to grant Mitchell judicial immunity; (3) the trial court erred in failing to require that Mitchell assert under oath the privilege against self-incrimination; and (4) defense counsel's failure to call Mitchell to the stand constituted ineffective assistance of counsel.

As we have previously explained, no court in this state has ever decided that granting a defense witness immunity from prosecution for his or her testimony was essential "to vindicate a criminal defendant's rights to compulsory process and a fair trial." (*People* v. *Hunter, supra*, 49 Cal.3d 957, 974.) This court has explained that if immunity for a defense witness is ever constitutionally compelled, it is so compelled only when the witness's testimony is both clearly exculpatory and essential to an effective defense, and when no strong governmental interest weighs against the grant of immunity. (*Ibid.*)

Because the defense made no offer of proof as to Mitchell's testimony, the record before us on this appeal provides no basis for determining that his testimony was either clearly exculpatory or essential to an effective defense.

Therefore, defendant has not shown that failure to grant Mitchell immunity resulted in the denial of defendant's rights to compulsory process and a fair trial.

 Also unavailing are defendant's related contentions, that the trial court on its own initiative should have compelled Mitchell to assert under oath his privilege against self-incrimination, and that defense counsel's failure to call Mitchell to the stand constituted ineffective assistance. After talking with both Mitchell and his counsel, defense counsel announced on the record that he saw no reason "to even call him to the stand." Because Mitchell was a defense witness, this decision was properly for defense counsel, not the trial court. The record provides no basis for concluding that defense counsel's decision not to require Mitchell to assert the privilege under oath was one that would not have been made by a reasonably competent attorney acting as a diligent advocate, or that it is reasonably probable a more favorable determination would have resulted had counsel acted differently. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 584; *Strickland* v. *Washington, supra,* 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699].)

## D. *Testimonial Competence of Kevin P.*

 The victim's youngest son, Kevin P., testified at trial as a prosecution witness. When he gave this testimony, Kevin was seven years old. Defense counsel did not challenge Kevin's competency as a witness, and neither counsel nor the trial court questioned Kevin on voir dire. Defendant advances these contentions on the subject of Kevin's testimony: (1) the trial court erred in not raising the issue of competency on its own motion; (2) admission of the testimony violated defendant's right of confrontation under the Sixth Amendment to the federal Constitution; (3) admission of the testimony violated defendant's right to a reliable verdict under the Eighth and Fourteenth Amendments to the federal Constitution; (4) the trial court erred in not instructing the jury on its own motion to view the testimony with caution; and (5) defense counsel's failure to challenge Kevin's testimonial competence constituted ineffective assistance of counsel.

### 1. *Trial court determination of competence*

Except as provided by statute, "every person, irrespective of age, is qualified to be a witness." (Evid. Code, § 700; see also Pen. Code, § 1321.) The primary statutory grounds for disqualification are inability to express oneself comprehensibly on the subject of the testimony and inability to understand the obligation to tell the truth. (Evid. Code, § 701.) A

party who claims that a witness lacks either or both of these basic qualifications bears the burden at trial of proving disqualification. (*People* v. *Mincey, supra,* 2 Cal.4th 408, 444.) Moreover, to preserve for appeal a claim that a witness lacked testimonial competence, a party must object on this ground in the trial court. (*People* v. *Singh* (1920) 182 Cal. 457, 484 [188 P. 987]; *People* v. *Scaggs* (1957) 153 Cal.App.2d 339, 353-354 [314 P.2d 793].) Defendant may not circumvent this objection requirement by claiming that the trial court should have inquired into the witness's qualifications on its own.[6]

## 2. *Right of confrontation*

▇▇▇▇ The Sixth Amendment to the federal Constitution gives an accused the right "to be confronted with the witnesses against him [or her]." (See also Cal. Const., art. I, § 15; Pen. Code, § 686.) Although the right of confrontation requires that an accused receive "an adequate opportunity to cross-examine adverse witnesses" (*U.S.* v. *Owens* (1988) 484 U.S. 554, 557 [98 L.Ed.2d 951, 956-957, 108 S.Ct. 838]), it does not protect against testimony that is " 'marred by forgetfulness, confusion, or evasion' " (*id.* at p. 558 [98 L.Ed.2d at p. 957], quoting *Delaware* v. *Fensterer* (1985) 474 U.S. 15, 21 [88 L.Ed.2d 15, 20-21, 106 S.Ct. 292]).

We have carefully reviewed the testimony of Kevin P., and, in particular, his testimony on cross-examination. Not surprisingly, the testimony contains some inconsistencies, and the witness did not demonstrate total recall of the events on the day his mother died. But the witness's answers on the whole were lucid and responsive, and nothing in his testimony reveals either an inability to distinguish truth from falsehood (or perception from imagination) or a failure to appreciate his obligation as a witness to tell the truth. We are satisfied that the process of examination and cross-examination gave the jury an adequate basis on which to evaluate the truth of the witness's testimony. The Sixth Amendment's confrontation clause requires no more. (*U.S.* v. *Owens, supra,* 484 U.S. 554, 559 [98 L.Ed.2d 951, 957-958].)

---

[6]In *People* v. *Burton* (1961) 55 Cal.2d 328 [11 Cal.Rptr. 65, 359 P.2d 433], this court observed that the defendant's challenge to the competency of a prosecution witness "could be regarded as impliedly waived by failure to raise it in the trial court," but nonetheless proceeded.to consider and reject the claim on the merits because " 'it would be manifestly unfair to affirm appellant's conviction . . . merely because of the failure of his attorney to make proper objection in the trial court.' " (At p. 341, quoting *People* v. *Allen* (1955) 131 Cal.App.2d 72, 73 [279 P.2d 996].) We do not read this language as abrogating the requirement that challenges to the competency of a witness be made in the trial court. Rather, it appears that the court was anticipating and responding to a claim of ineffective assistance of trial counsel.

### 3. *Right to a reliable verdict*

Also without merit is defendant's challenge under the federal Constitution's Eighth Amendment, which forbids infliction of "cruel and unusual punishments." Although the Eighth Amendment imposes heightened reliability standards for both guilt and penalty determinations in capital cases (see *Beck* v. *Alabama* (1980) 447 U.S. 625, 638 [65 L.Ed.2d 392, 403, 100 S.Ct. 2382]), defendant gives us no reason to conclude that those standards were not met here. As this court remarked in rejecting essentially the same contention, defendant "was given an opportunity to be heard and to cross-examine in a judicial forum." (*People* v. *Mincey, supra,* 2 Cal.4th 408, 445.)

### 4. *Ineffective assistance of counsel*

 As we have seen, a defendant seeking relief on the basis of ineffective assistance must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Fosselman, supra,* 33 Cal.3d 572, 584; see also *Strickland* v. *Washington, supra,* 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699].) If the record contains an explanation for the challenged aspect of counsel's representation, the reviewing court must determine "whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate." (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) On the other hand, if the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." (*Id.* at p. 426.)

Here, the record contains no explanation for defense counsel's failure to challenge Kevin P.'s testimony, nor does it show that counsel was asked for an explanation and failed to provide one, nor, finally, is this a situation in which there could be no satisfactory explanation for counsel's conduct. Acting as a reasonably competent defense attorney, counsel may have declined to challenge the competence of the child witness because, in counsel's judgment, the challenge would have been futile or because counsel believed that the child's testimony would on balance be helpful to the defense. Under the rule set forth above, we therefore reject the claim of ineffective assistance.

### 5. *Jury instruction*

 We also reject defendant's claim that the trial court should have instructed the jury on its own initiative to view Kevin P.'s testimony with

caution. Section 1127f requires the trial court, "upon the request of a party," to instruct the jury on evaluation of the testimony of a witness who is 10 years of age or younger.[7] Absent a request, however, the trial court is not required to give either the statutory instruction or some other form of cautionary instruction. (See *People v. Mincey, supra,* 2 Cal.4th 408, 445.)

E. *Prosecutorial Misconduct in Jury Argument*

Defendant contends that the prosecutor twice committed misconduct during closing argument to the jury at the guilt phase. According to defendant, the misconduct consisted in raising the issue of defendant's potential for rehabilitation and in appealing to racial prejudice.

1. *Potential for rehabilitation*

■ Defendant cites as misconduct this portion of the prosecutor's argument: "You see, one of the things that's interesting is [defendant] has to portray himself in this case as the big wheeler dealer. [¶] 'Boy, before I went to jail for grand theft person, I was making eight hundred to $1,200 a week cash.' That's not after taxes, ladies and gentlemen—or that is after taxes, because he doesn't pay taxes. [¶] Imagine, 40 to $60,000 a week in your pocket—a week, I'm sorry, a year in your pocket. I wonder when the last time you were able to tuck a $100 cash in your pocket and just go your way. If I understand what's going on in our society properly, most of us are not in that fortunate position, and then of course when he gets out of jail he's back making hundreds of dollars."

Because the defense did not object to these statements at trial, the claim of misconduct is not reviewable on appeal unless the statement was so prejudicial that an admonition by the trial court could not have cured the harm. (*People v. Medina* (1990) 51 Cal.3d 870, 895 [274 Cal.Rptr. 849, 799 P.2d 1282].) Here, we conclude that the argument was not prejudicial at all.

Defendant maintains that in the statements quoted above the prosecutor "argued without evidentiary support that [defendant] would not be rehabilitated by prison, thus improperly inviting the jury to convict him for what he might do in the future rather than for what he had allegedly done in the past."

[7]The required instruction says: "In evaluating the testimony of a child you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. Although, because of age and level of cognitive development, a child may perform differently as a witness from an adult, that does not mean that a child is any more or less credible a witness than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child." (§ 1127f.)

Defendant misapprehends the argument. He evidently thinks that the final words of the quoted passage—". . . when he gets out of jail he's back making hundreds of dollars"—constitute a prediction of future events. To the contrary, a reasonable juror would understand them as a description of past events as related in defendant's testimony. Defendant had testified that he had earned substantial profits, both before and after an incarceration for grand theft from the person, by selling rock cocaine, the evident purpose of this testimony being to show that defendant would have no need to commit a robbery and that he could afford to trade cocaine for sex. The prosecutor was merely describing this testimony, before proceeding to challenge it. In the immediately following portion of the argument, not cited by defendant, the prosecutor maintained that defendant had testified inconsistently both about the amount of his earnings and about the location of the profits remaining at the time of his arrest, and that defendant "is not a wheeler dealer." No reasonable juror would understand the argument as an adverse comment on defendant's potential for rehabilitation.

### 2. *Appeal to racial prejudice*

■ To persuade the jury to reject defendant's testimony that the victim had consented to sexual intercourse, the prosecutor made this argument: "And what [defendant] wants you to believe, and what I believe to be perhaps the most telling thing in this whole case, is that this woman who, from all appearances is a happily married mother of three trying to make ends meet living out there where they can have a house they can afford, taking in sewing to help meet the family budget, keeping that kind of a house, that this woman is going to have intercourse with a strange man—frankly any man—a black man, on her living room couch with her five year old in the house."

Prosecutorial argument that includes racial references appealing to or likely to incite racial prejudice violates the due process and equal protection guarantees of the Fourteenth Amendment to the federal Constitution. (*U.S.* v. *Doe* (D.C. Cir. 1990) 903 F.2d 16, 24-25 [284 App.D.C. 199]; *McFarland* v. *Smith* (2d Cir. 1979) 611 F.2d 414, 416-417; *Miller* v. *State of N.C.* (4th Cir. 1978) 583 F.2d 701, 707; *United States* ex rel. *Haynes* v. *McKendrick* (2d Cir. 1973) 481 F.2d 152, 159; *United States* v. *Grey* (6th Cir. 1970) 422 F.2d 1043, 1045-1046; see also, *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 309, fn. 30 [95 L.Ed.2d 262, 289-290, 107 S.Ct. 1756, 1776] ["The Constitution prohibits racially biased prosecutorial arguments."].) Because racial prejudice can strongly compromise a juror's impartiality (*Miller* v. *State of N.C.*, *supra*, at p. 706; *United States* ex rel. *Haynes* v. *McKendrick*, *supra*, at p. 157; *People* v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d

564]), even neutral, nonderogatory references to race are improper absent compelling justification.[8] (*U.S.* v. *Doe*, *supra*, at p. 25, fn. 63; *McFarland* v. *Smith*, *supra*, at pp. 416-417, 419.)

Although we do not find compelling justification for the prosecutor's racial reference in this case, neither do we find prejudice to defendant. The reference to race occurred in the course of an argument listing factors that undermined the credibility of defendant's testimony that the victim had consented to sexual intercourse. The racial reference added little to the force of the argument, which relied primarily on the implausibility of the victim engaging in intercourse with a virtual stranger in the presence of her five-year-old child. The racial reference was a brief and isolated remark; there was no continued effort by the prosecutor to call attention to defendant's race or to prejudice the jury against him on account of race. We are persuaded beyond a reasonable doubt that the prosecutor's racial reference in argument did not affect the outcome.

F. *Ineffective Assistance of Counsel for Failure to Object to Evidence of Prior Conviction*

 Defendant contends that evidence of his prior conviction for grand theft from the person (§ 487, subd. 2) was not admissible to impeach his credibility as a witness. From this premise, defendant argues that his trial attorney rendered ineffective assistance by failing to solicit a ruling on the use of this prior conviction for impeachment, and by eliciting testimony from defendant on direct examination admitting the conviction.

Contrary to defendant's argument, his prior conviction for grand theft was admissible for purposes of impeachment. Grand theft necessarily involves both moral turpitude and dishonesty (*People* v. *Wheeler* (1992) 4 Cal.4th 284, 297 [14 Cal.Rptr.2d 418, 841 P.2d 938]), it is dissimilar from and substantially less inflammatory than the charged offense of capital murder, and defendant's conviction for this offense had occurred just three years before defendant's testimony. (See *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) Because the prosecution could and undoubtedly would have used the prior conviction to impeach defendant, defendant's attorney made a reasonable and common tactical decision to put the prior conviction before the jury promptly at the outset of defendant's

---

[8]A reference to race as a factor in an eyewitness identification of a suspect is universally regarded as permissible. (*U.S.* v. *Doe*, *supra*, 903 F.2d 16, 25; *People* v. *Linson* (1956) 47 Cal.2d 380, 383 [303 P.2d 537].) And when the defense has falsely accused the prosecution of racial prejudice, the prosecutor may respond with a denial of the charge and an affirmation of the right of all persons to equal treatment regardless of race. (*People* v. *Jones* (1962) 205 Cal.App.2d 460, 465-466 [23 Cal.Rptr. 418].)

direct examination. Defendant has not demonstrated that this action consti-
tuted ineffective assistance in this case.

## G. *Ineffective Assistance of Counsel for Failure to Move to Suppress Evidence Seized From Camper*

Defendant contends that investigating officers violated the constitutional proscription against unreasonable searches (U.S. Const., 4th Amend.) when they searched the Cudjo camper following defendant's arrest; that certain prosecution exhibits at trial (defendant's survival knife, one pair of MacGregor athletic shoes, and a pair of cut-off jeans) were the tainted fruit of this illegal search; and that he was denied his constitutional right to effective assistance of counsel (U.S. Const., 6th Amend.) by his trial counsel's failure to bring a motion to suppress this evidence.

The record before us does not support defendant's contention. Because the legality of the search was never challenged or litigated, facts necessary to a determination of that issue are lacking. For example, defendant assumes that the officers did not have a warrant authorizing the search, but he provides no citation to the record to establish that fact. Also, as the Attorney General notes, Maxine Cudjo testified at the preliminary hearing that she consented to the search of the camper, and the search might be upheld on this basis. Defendant suggests in response that the consent may be invalid, but this is just speculation. Because defendant has not proven that the search was unlawful, his claim of ineffective assistance of counsel must be rejected. (See *Kimmelman* v. *Morrison* (1986) 477 U.S. 365, 375 [91 L.Ed.2d 305, 319, 106 S.Ct. 2574]; *People* v. *Wharton* (1991) 53 Cal.3d 522, 576 [280 Cal.Rptr. 631, 809 P.2d 290].)

## H. *Waiver of Sequestered Hovey Voir Dire*

Before jury selection, the trial court showed the parties a proposed questionnaire to be completed by each prospective juror. Of the 56 proposed questions, 3 dealt with the prospective juror's views on the death penalty.[9] After minor changes, the parties approved the questionnaire. While the parties were discussing the questionnaire and related jury selection procedures, the trial court suggested that the parties by stipulation dispense with

---

[9]The first question asked for the prospective juror's "general feelings regarding the death penalty." The second question asked whether the prospective juror believed the death penalty was applied too seldom or too often, whether the prospective juror belonged to any group that advocated either increased use or abolition of the death penalty, and whether the prospective juror's views were based on religious considerations. The third question incorporated the four standard *Witherspoon* questions (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]).

the procedure mandated by *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301], under which the death-qualification portion of the voir dire is conducted with each prospective juror individually and in sequestration. The prosecutor and defense counsel so stipulated and defendant personally waived the *Hovey* voir dire procedure with the understanding that sequestered voir dire of individual prospective jurors would be available based on responses to the questionnaires and answers given in open court.

■■■ Defendant contends that the trial court erred in soliciting and accepting the parties' stipulation and defendant's personal waiver of the *Hovey* voir dire procedure. Defendant further contends that in agreeing to dispense with the *Hovey* procedure, defendant's trial counsel violated defendant's rights under the federal and state Constitutions to the effective assistance of counsel (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15).

No statute requires the *Hovey* voir dire procedure, nor has any court held it to be mandated by the Constitution of this state or of the United States. Rather, this court invoked its "supervisory authority over California criminal procedure" to declare that henceforth the death-qualification voir dire should be conducted with each juror individually and in sequestration. (*Hovey, supra*, 28 Cal.3d 1, 80.) When this court adopted the rule, we cited evidence that prolonged discussion of penalty phase procedures during voir dire fosters a perception that the penalty phase will occur, and thereby conditions jurors to anticipate that they will find the defendant guilty. (*Id.* at pp. 70-80.) Also, prospective jurors who see other jurors excused for cause after expressing reluctance or unwillingness to return a death verdict may conclude that the law disapproves of such attitudes and "may in consequence feel less willing to express or rely on such attitudes in their consideration of penalty." (*Id.* at p. 74, fn. omitted.)

As a general rule, a person is free to waive the advantage of any law or rule intended primarily or exclusively for that person's own benefit. (Civ. Code, § 3513.) This court adopted the *Hovey* voir dire procedure to benefit defendants in capital cases (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 51 [5 Cal.Rptr.2d 495, 825 P.2d 388] ["the sequestered voir dire is for the benefit of the defendant"]), and defendant offers no persuasive reason for depriving defendants in capital cases of the freedom to waive *Hovey* voir dire procedures. We conclude that capital defendants may waive the *Hovey* procedure and that defendant validly waived it in this case.

We reject also defendant's contention that his trial counsel's stipulation to dispense with the *Hovey* voir dire procedure constituted ineffective assistance. The record contains no explanation for counsel's decision to dispense

with *Hovey* voir dire procedures. In this situation, as we have seen, an appellate court will reject a claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation[.]" (*People* v. *Pope, supra*, 23 Cal.3d 412, 426.)

Defendant maintains that there could be no satisfactory explanation for a decision to waive a procedure that is clearly advantageous to the defense, but the argument is based on a false premise. Defendant assumes that by stipulating to dispense with the *Hovey* voir dire procedure defense counsel exposed defendant to the risks of collective voir dire mentioned in *Hovey, supra*, 28 Cal.3d 1. But the procedure used in this case was far different from the pre-*Hovey* collective voir dire; competent counsel might well conclude that it protected defendant's interests as well as, or better than, the *Hovey* procedure.

The record reveals that the death-qualification voir dire in this case occurred primarily through the juror questionnaires rather than through voir dire in open court. Because the prospective jurors answered the questionnaires individually and in isolation from each other, defendant received the primary advantage of *Hovey* voir dire—minimizing each prospective juror's exposure to the death-qualification voir dire of others (*Hovey, supra*, 28 Cal.3d 1, 81). By including the death-qualification questions among a much larger group of questions, the questionnaire avoided one of the main drawbacks of the *Hovey* voir dire procedure—giving special emphasis to the death-qualification aspect of voir dire. Moreover, the stipulation did not waive the *Hovey* procedure entirely; defendant retained the right to obtain sequestered voir dire of individual jurors. Although some death-qualification questioning did occur during general voir dire, competent counsel might well conclude that a slight exposure of prospective jurors to the death-qualification of others was a small price to pay for the additional "reduction in the pretrial emphasis on penalty" (*id.* at p. 80) obtained by conducting death-qualification voir dire primarily through the questionnaires. (Cf. *People* v. *Lewis* (1990) 50 Cal.3d 262, 289-290 [266 Cal.Rptr. 834, 786 P.2d 892] [defense counsel's stipulation limiting death-qualification voir dire to four standard questions does not establish incompetence].)

I. *Failure to Instruct on Intent to Kill*

In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862], this court held that the felony-murder special circumstance (§ 190.2, subd. (a)(17)) requires proof and an express jury finding of intent to kill. Although we overruled this holding in *People* v.

*Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], it continues to control cases like this one in which the crime was committed after *Carlos* and before *Anderson.* (*People* v. *Fierro* (1991) 1 Cal.4th 173, 227 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Here, the trial court did not instruct the jury that intent to kill was an essential element of either the robbery-murder or the burglary-murder special circumstance, and the jury made no finding on this issue. Error in failing to instruct on an element of a special circumstance is subject to harmless error analysis under the standard of *Chapman* v. *California, supra,* 386 U.S. 18. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Odle* (1988) 45 Cal.3d 386, 414, 415 [247 Cal.Rptr. 137, 754 P.2d 184].)

As in the recent case of *People* v. *Johnson* (1993) 6 Cal.4th 1 [23 Cal.Rptr.2d 593, 859 P.2d 673], "the only reasonable conclusion one can draw from the evidence and the jury's findings is that defendant intentionally murdered [the victim]." (At p. 47.) The victim's son testified that an intruder generally matching defendant's description bound and gagged the victim in a manner making either self-defense or provocation impossible. The body was found in that same condition. The victim had died from multiple blows to the back and sides of the head, fracturing the skull and lacerating the brain. The systematic and prolonged assault with manifestly deadly force on the helpless victim is consistent only with an intent to kill. The evidence to this effect stands uncontroverted. Relying on an alibi defense, defendant presented no evidence that the killing was other than intentional. Therefore, we are persuaded beyond a reasonable doubt that defendant was not prejudiced by the trial court's error in not instructing on intent to kill as an element of the felony-murder special circumstance.

### J. *Cumulative Impact of Guilt Phase Errors*

Defendant maintains that the cumulative impact of the guilt phase errors mandates reversal. We conclude that the errors that occurred, whether considered separately or together, were inconsequential.

### III. PENALTY ISSUES

### A. *Ineffective Assistance of Counsel*

#### 1. *Argument about pardon and appeal*

During argument to the jury at the penalty phase, defense counsel made these references to the right of appeal and the possibility of pardon or commutation of sentence:

"You can vote for an option of death, and you know what that is, it's a termination of life. Will it be carried out immediately? No. It'll be some time before the sentence will be imposed—pardon me, carried out, not imposed.

"On the other hand, you have something called life without possibility of parole.

"In the beginning of this case we talked about it, you were assured by the defense and also by Mr. Ogden [the prosecutor], and by the bench definitely that life without possibility of parole as it's presently understood and defined, it means exactly that period.

"It leaves open the possibility of perhaps two other things which are somewhat—if not extraordinary, at least rare events. One may be gubernatorial pardon. That is not given on whimsy. The other may be granting of an appeal which results in some other course."

After noting that defendant continued to protest his innocence, defense counsel continued as follows:

"You have the opportunity to balance the scale, if you wish, impose a sentence of death. Ultimately that sentence may be carried out. You should assume for your purposes that if you do, it will be carried out, whether it is in 1990 or 1998 or 2061. At some point, that sentence will be carried out under the current state of the law, barring the one thing that I indicated earlier and that would be a gubernatorial pardon."

Defense counsel then alluded to a television drama, apparently based on fact, in which an individual convicted of murder was shown to be innocent by evidence produced many years after the conviction. Counsel then proceeded with his argument this way:

"I would hope that you'll reconsider some of the evidence. We would hope that you may go back over the mechanics of this event as the People have sought to prove them to you, and that you'll come back with a determination of life without possibility of parole may be the appropriate sanction in this case.

"You will have done your job. Mr. Cudjo cannot look forward to early parole or benefit or credit for performing well while in prison, because those are not criteria that would set aside that kind of a result. He can then continue to exhaust what rights he may have, something may be done that brings to light perhaps a way that you folks would not or could not see."

Defendant contends that the references to appeal and pardon constituted ineffective assistance.

In *People* v. *Ramos* (1984) 37 Cal.3d 136, 150-159 [207 Cal.Rptr. 800, 689 P.2d 430], we held that a defendant was denied due process of law under the state Constitution when the court instructed the jury at the penalty phase of a capital case that the governor could commute a sentence of life imprisonment without possibility of parole. We concluded that the instruction was misleading because it failed to note that the power of commutation extended to a sentence of death as well as to a sentence of life without parole. In addition, the instruction could cause jurors to speculate on future events or to impose a death verdict on the impermissible basis that the defendant might otherwise eventually be released from custody.

In a footnote, we observed that it was a "close question" whether the subject of commutation should be addressed at all in jury instructions. We stated that if the jury inquired about the subject, or if the defense requested an instruction, the court should make a brief statement explaining that the power of commutation extended to both a sentence of death and a sentence of life without possibility of parole, but emphasizing that "it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence." (*People* v. *Ramos*, *supra*, 37 Cal.3d 136, 159, fn. 12.)

The defense argument in this case posed little risk of prejudice. Defense counsel referred to the power of pardon as extending to both the sentence of death and the sentence of life without possibility of parole, counsel characterized commutation of sentence and reversal of sentence on appeal as "rare events," and counsel noted that a sentence of life without possibility of parole "means exactly that period." Nothing in counsel's argument carried the improper suggestion that the jury could take its sentencing responsibility lightly because an erroneous death sentence would be subject to correction by appeal or by commutation. (See *People* v. *Fierro*, *supra*, 1 Cal.4th 173, 245; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1106 [259 Cal.Rptr. 630, 774 P.2d 659].) On the contrary, defense counsel admonished the jury to assume that a sentence of death would eventually be carried out.

Finally, we do not agree that the argument lacked a sound tactical purpose. The defense at the penalty phase was lingering doubt. Counsel argued that the prosecution's evidence was not conclusive, that defendant continued to maintain his innocence, and that evidence establishing his innocence might later come to light. In referring to the governor's powers of pardon and commutation, defense counsel's main point appeared to be that

these powers, though rarely exercised, exist because innocent men are sometimes convicted and innocence is sometimes demonstrated by evidence produced long after a conviction. The references to the governor's powers thus reinforced the lingering doubt argument.

### 2. *Argument about burden of proof*

Defense counsel gave the jury this description of the process of determining penalty: "The law in the state of California allows for a death penalty if 12 people like you *feel* that it is appropriate and fix it as the ultimate penalty to be handed out in any given sentence or case." (Italics added.) Later, defense counsel added: "[T]he standard of proof now is less than it was before, so if you simply want to balance the ledger you could flip a coin. It would be inappropriate, but you could determine it that way, and I don't mean by flipping a coin, but you can in your own mind say, 'Well, we have two choices, which shall it be.' "

Defendant contends that by these words defense counsel mischaracterized and trivialized the burden of proof and the penalty determination process, and that there can be no justification for these statements. We disagree.

Preliminarily, we note that defense counsel's argument was followed by the court's instructions to the jury, and that these instructions resolved any ambiguities or misimpressions. On the subject of penalty determination, the court instructed in these words:

"After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. [¶] To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they warrant death instead of life without parole."

The first challenged remark by defense counsel is a substantially correct description of the jury's role at the penalty phase of a capital case. The

penalty jury's role is to determine, as defense counsel stated, which of the two alternative penalties—death or life imprisonment without possibility of parole—is appropriate. Because the determination of appropriateness is a reasoned moral decision, rather than an emotional response, the word "feel" is somewhat inapt. But any confusion in this regard was dispelled by the court's instructions quoted above.

The second challenged remark by defense counsel is also substantially correct. ■■■ To return a death verdict the jury must be persuaded that aggravation so outweighs mitigation that such a verdict is appropriate, but · "neither [party] has the burden of proof on that issue" (*People* v. *Daniels* (1991) 52 Cal.3d 815, 890 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 58-59 [255 Cal.Rptr. 631, 767 P.2d 1109]), and the jury need not be persuaded of its sentencing decision beyond a reasonable doubt (*People* v. *Bell* (1989) 49 Cal.3d 502, 553 [262 Cal.Rptr. 1, 778 P.2d 129]). ■■■ The point of counsel's remark was merely that the two penalty options were equally available, that there was no "thumb"—in the form of a presumption, burden of proof, or other legal rule—on either side of the scale, and that the jurors should therefore enter the penalty deliberations with their minds open to both potential verdicts.

### 3. *Failure to present mitigating evidence*

The only defense evidence at the penalty phase was defendant's testimony, in which he once again denied killing Amelia P. Defendant contends that his trial counsel failed to effectively present a lingering doubt defense to penalty, and failed to present any other evidence that would have provided a basis for a sentence less than death.

The appellate record does not disclose what mitigating evidence was available that was not presented, or what reasons defense counsel may have had for not presenting it. "On a silent record, as we have here, we will not assume that the defense counsel's failure to present mitigating evidence rendered his assistance ineffective. Any assertion that counsel was inadequate in this regard must be raised on habeas corpus." (*People* v. *Diaz* (1992) 3 Cal.4th 495, 566 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

### 4. *Perfunctory closing argument*

Defendant characterizes his counsel's penalty phase argument as brief (eight pages of transcript), perfunctory, unfocussed, and generally a "dismal performance." The effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript, and the length of an

argument is not a sound measure of its quality. Although defense counsel's argument in this case appears to have been somewhat lacking in clarity, not to mention eloquence, we are not persuaded that it fell below the standard of reasonably competent representation or that there is a reasonable probability that a better presentation would have resulted in a more favorable penalty verdict.

### B. Ineffective Assistance for Failure to Renew Request to Admit Evidence of Confession by Defendant's Brother

Defendant contends that his trial counsel should have renewed at the penalty phase his effort to admit the testimony of John Culver to the effect that Gregory Cudjo had confessed to the murder of Amelia P. He argues that in the penalty setting the trial court might have been persuaded to reconsider its earlier ruling excluding the evidence. Had the court admitted the evidence, it would have strengthened the lingering doubt penalty defense.

We have previously concluded that Culver's testimony was erroneously excluded at the guilt phase, but that the error was not prejudicial. Because the same evidentiary rules govern admissibility of evidence at the guilt and penalty phases, we question whether defense counsel demonstrates incompetence by failing to press at the penalty phase for admission of evidence excluded at the guilt phase. But we need not decide whether reasonably competent counsel would have again sought admission of Culver's testimony. For the reasons already stated, we are persuaded that Culver's testimony was lacking in credibility and could not have affected the outcome at either the guilt or penalty phases of the trial.

### C. Instructions Regarding Special Circumstances

Defendant contends that the trial court should have instructed the jury on its own initiative not to treat the robbery and burglary special circumstances as separate circumstances in aggravation. We have previously rejected the same contention. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 528-529 [273 Cal.Rptr. 537, 797 P.2d 561].) Defendant offers no new argument on this point, conceding that he raises the issue only to preserve it for federal review.

### D. Trial Court's Review of Probation Report

Before ruling on the automatic motion to modify penalty, the trial court announced that it had read and considered the probation report. Defendant argues that this was improper because the trial court is to consider

only the evidence before the jury when ruling on the motion. (See *People* v. *Lewis, supra,* 50 Cal.3d 262, 287.)

We conclude that any error was harmless. The trial court did not refer to any material in the probation report when giving its reasons for denying the modification motion. Therefore, we must assume that the court was not improperly influenced by the report. (*People* v. *Raley* (1992) 2 Cal.4th 870, 922-923 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People* v. *Fauber* (1992) 2 Cal.4th 792, 866-867 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

## E. *Denial of Automatic Modification Motion*

In stating its reasons for denying the automatic motion to modify the death penalty, the trial court recited its own findings that the murder of Amelia P. was intentional, premeditated, deliberate, willful, and committed with malice aforethought, and that the murder was committed in the course of a rape.

Defendant contends that it was improper for the trial court to base its denial of the modification motion upon findings of intentional murder and rape that the jury never made. We disagree.

In ruling on the automatic motion for modification, the trial judge "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (§ 190.4, subd. (e).) Among the aggravating circumstances specified in section 190.3 is the "circumstances of the crime of which the defendant was convicted in the present proceeding" (§ 190.3, factor (a)). Here, the trial judge did no more than to evaluate the circumstances of defendant's capital crime. (See *People* v. *Turner* (1990) 50 Cal.3d 668, 716-717 [268 Cal.Rptr. 706, 789 P.2d 887].) In this regard, the absence of express jury findings is not significant. The jury never made express findings on rape or intentional murder because these issues were never submitted to the jury, not because it resolved these issues in defendant's favor. In the absence of any express jury findings on these issues, the trial judge was permitted, and indeed required, to make whatever findings he deemed necessary to properly evaluate the circumstances of the offense in order to independently determine whether the weight of the evidence supported the verdict of death.

## F. *Ineffective Assistance for Failure to Make Posttrial Motions*

Defendant contends that his representation by trial counsel during posttrial proceedings was inadequate because counsel failed to present available

grounds for granting a new trial and failed to provide appropriate evidence and written authorities. We reject the contention. Defendant has failed to show there were any meritorious claims to present by way of posttrial motions.

### G. Cumulative Effect of Guilt and Penalty Phase Errors

Defendant contends that the cumulative effect of guilt and penalty phase errors requires reversal of at least the penalty verdict. We disagree. Whether considered separately or in combination, the few errors that occurred during the guilt and penalty phases of defendant's trial were inconsequential.

### H. Constitutionality of 1978 Death Penalty Law

Defendant challenges the constitutionality of the 1978 death penalty law on a variety of grounds. We have previously rejected these contentions. (See, e.g., People v. Livaditis (1992) 2 Cal.4th 759, 786 [9 Cal.Rptr.2d 72, 831 P.2d 297]; People v. Visciotti, supra, 2 Cal.4th 1, 78-79.) In particular, we have rejected the contention that certain aggravating factors, including the circumstances of the crime (§ 190.3, factor (a)), other violent criminal activity by the defendant (§ 190.3, factor (b)), and the age of the defendant (§ 190.3, factor (i)), are impermissibly vague under the Eighth Amendment to the federal Constitution. (People v. Noguera (1992) 4 Cal.4th 599, 648-649 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; People v. Tuilaepa (1992) 4 Cal.4th 569, 594-595 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; People v. Hawthorne (1992) 4 Cal.4th 43, 77-79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Defendant has not persuaded us to reconsider any of these rulings.

### IV. Disposition

The judgment of death is affirmed.

KENNARD, J., Dissenting.—I agree with the majority that the trial court erred when it precluded a defense witness from testifying that defendant's brother, Gregory Cudjo, had confessed that he, acting alone, committed the capital crimes at issue here. But I do not agree that this error was harmless.

When it refused to permit defendant's witness to testify, the trial court violated defendant's rights under the federal and state Constitutions to present a defense. The effect of the federal constitutional error must be measured against the controlling federal standard, which requires reversal unless the error was harmless beyond a reasonable doubt. When applied to the record in this case, the federal standard compels reversal of the judgment as to both guilt and penalty. Therefore, I dissent.

I.

## Excluding the Testimony of Defendant's Witness Violated Defendant's Constitutional Right to Present a Defense

In an adversary system of adjudication, the right to be heard is essential to due process of law. (*Rock* v. *Arkansas* (1987) 483 U.S. 44, 51, fn. 8 [97 L.Ed.2d 37, 46, 107 S.Ct. 2704].) In a criminal prosecution, the defendant's right to be heard includes the right to summon and examine witnesses whose testimony is expected to support the defense case. Indeed, "[f]ew rights are more fundamental than that of an accused to present witnesses in his [or her] own defense." (*Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312-313, 93 S.Ct. 1038].) The right to summon and examine defense witnesses is guaranteed by both the state and federal Constitutions.

The Sixth Amendment to the United States Constitution guarantees to persons against whom the state brings criminal proceedings "the right . . . to have compulsory process for obtaining witnesses in [their] favor." The California Constitution contains a similar provision. (Cal. Const., art. I, § 15.)

Because the right to compel witnesses to appear in court would be hollow and useless if the government was free to prevent those witnesses from testifying, the compulsory process guarantee encompasses a substantive right to have defense witnesses testify before the trial jury. (*Taylor* v. *Illinois* (1988) 484 U.S. 400, 407-409 [98 L.Ed.2d 798, 809-811, 108 S.Ct. 646]; *Pennsylvania* v. *Ritchie* (1987) 480 U.S. 39, 56 [94 L.Ed.2d 40, 56-57, 107 S.Ct. 989]; *Washington* v. *Texas* (1967) 388 U.S. 14, 23 [18 L.Ed.2d 1019, 1025-1026, 87 S.Ct. 1920]; see *In re Martin* (1987) 44 Cal.3d 1, 29 [241 Cal.Rptr. 263, 74 P.2d 374].) The Sixth Amendment's right of compulsory process, which includes the right to have the testimony of defense witnesses received in evidence, is made applicable to state criminal trials· by the due process clause of the Fourteenth Amendment to the federal Constitution. (*Washington* v. *Texas*, *supra*, at pp. 17-19 [18 L.Ed.2d at pp. 1022-1023]; *Rock* v. *Arkansas*, *supra*, 483 U.S. 44, 52 [97 L.Ed.2d 37, 46]; *Pennsylvania* v. *Ritchie*, *supra*, at p. 45, fn. 5 [94 L.Ed.2d at pp. 49-50].)

Of course, the right to present defense witnesses at trial is not absolute. Although "a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his [or her] favor," it is also true that "the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." (*Taylor* v. *Illinois*, *supra*, 484 U.S. 400, 414 [98 L.Ed.2d 798, 813-814].)

Restrictions on the right to present defense evidence are constitutionally permissible if they " 'accommodate other legitimate interests in the criminal trial process' " and are not "arbitrary or disproportionate to the purposes they are designed to serve." (*Rock* v. *Arkansas, supra,* 483 U.S. 44, 55-56 [97 L.Ed.2d 37, 48-49], quoting *Chambers* v. *Mississippi, supra,* 410 U.S. 284, 295 [35 L.Ed.2d 297, 308-309]; accord, *Michigan* v. *Lucas* (1991) 500 U.S. 145 [114 L.Ed.2d 205, 211-213, 111 S.Ct. 1743, 1746-1747].)

In this case, excluding the testimony of defendant's witness, John Culver, was not reasonably necessary to further any legitimate governmental interest. Indeed, the majority effectively concedes as much when it concludes that no rule of evidence justified the exclusion, and that the trial court's ruling was therefore erroneous.

In particular, the ruling was not justified by the trial court's apparent belief that the proposed testimony would be untruthful. The decisions of the United States Supreme Court under the Sixth Amendment's compulsory process clause establish that, as one commentator has phrased it, the testimony of a defense witness may not be excluded because of doubts about the witness's credibility if the testimony is "capable of being rationally evaluated by a properly instructed jury for its probative value and weight." (Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases* (1978) 91 Harv.L.Rev. 567, 627, fn. 167.)

The high court first addressed this issue in 1967, in *Washington* v. *Texas, supra,* 388 U.S. 14. In that case, a defendant's attempt to offer exculpatory eyewitness testimony was frustrated by a state rule of evidence that barred a defendant from presenting the testimony of anyone who had been charged with the same crime. The court began its analysis with a look at the historical origins of the federal compulsory process clause:

"Joseph Story, in his famous Commentaries on the Constitution of the United States, observed that the right to compulsory process was included in the Bill of Rights in reaction to the notorious common-law rule that in cases of treason or felony the accused was not allowed to introduce witnesses in his defense at all. Although the absolute prohibition of witnesses for the defense had been abolished in England by statute before 1787, the Framers of the Constitution felt it necessary specifically to provide that defendants in criminal cases should be provided the means of obtaining witnesses so that their own evidence, as well as the prosecution's, might be evaluated by the jury.

"Despite the abolition of the rule generally disqualifying defense witnesses, the common law retained a number of restrictions on witnesses who

were physically and mentally capable of testifying. To the extent that they were applicable, they had the same effect of suppressing the truth that the general proscription had had. Defendants and codefendants were among the large class of witnesses disqualified from testifying on the ground of interest. A party to a civil or criminal case was not allowed to testify on his own behalf for fear that he might be tempted to lie. Although originally the disqualification of a codefendant appears to have been based only on his status as a party to the action, and in some jurisdictions co-indictees were allowed to testify for or against each other if granted separate trials, other jurisdictions came to the view that accomplices or co-indictees were incompetent to testify at least in favor of each other even at separate trials, and in spite of statutes making a defendant competent to testify in his own behalf. It was thought that if two persons charged with the same crime were allowed to testify on behalf of each other, 'each would try to swear the other out of the charge.' This rule, as well as the other disqualifications for interest, rested on the unstated premises that the right to present witnesses was subordinate to the court's interest in preventing perjury, and that erroneous decisions were best avoided by preventing the jury from hearing any testimony that might be perjured, even if it were the only testimony available on a crucial issue." (*Washington* v. *Texas, supra,* 388 U.S. 14, 19-21 [18 L.Ed.2d at pp. 1023-1024], fns. omitted.)

Having thus concluded that the compulsory process clause was introduced into the federal Constitution at least in part to preclude the operation of exclusionary rules based on fear of perjured testimony, the high court recalled language in one of its earlier decisions, *Rosen* v. *United States* (1918) 245 U.S. 467, 471 [62 L.Ed. 406, 409, 38 S.Ct. 148], referring to " 'the conviction of our time that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court . . . .' " (*Washington* v. *Texas, supra,* 388 U.S. 14, 22 [18 L.Ed.2d at pp. 1024-1025].) The court immediately noted that although the decision in *Rosen* "rested on nonconstitutional grounds, we believe that its reasoning was required by the Sixth Amendment." (388 U.S. at p. 22 [18 L.Ed.2d at pp. 1024-1025].)

Applying this same reasoning to the issue before it, the court concluded that the defendant had been "denied [the] right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." (*Washington* v. *Texas, supra,* 388 U.S. 14, 23 [18 L.Ed.2d 1019, 1025-1026].)

The United States Supreme Court has subsequently reaffirmed this view of the right of compulsory process[1] in a case concerning a state rule of evidence restricting a defendant's ability to testify. Referring to the common law rule that barred an accused from testifying, the court said: "There is no justification today for a rule that denies an accused the opportunity to offer his [or her] own testimony. *Like the truthfulness of other witnesses*, the defendant's veracity, which was the concern behind the original common-law rule, can be tested adequately by cross-examination. See generally Westen, The Compulsory Process Clause, 73 Mich. L. Rev. 71, 119-120 (1974)." (*Rock* v. *Arkansas, supra,* 483 U.S. 44, 52 [97 L.Ed.2d 37, 46, 107 S.Ct. 2704], italics supplied.)

From these decisions of the high court, I conclude that the Sixth Amendment's compulsory process guarantee requires that defense witnesses be permitted to testify to the jury, regardless of the trial court's apparent distrust of the proposed testimony, if the credibility question is one that the jury is reasonably well equipped to deal with. Here, the reasons for the trial court's apparent distrust of the defense witness—his prior friendship with defendant, inconsistencies both within his testimony and between his testimony and other evidence in the case—were reasons that the trial jury was competent to assess.

Finally, I reject the majority's suggestion that there was no constitutional violation in this case because the defendant's witness was barred from testifying, not by a state statute or rule of evidence, but as a result of the trial court's erroneous application of state law. The suggestion amounts to an odd distortion of the nature and purpose of the constitutional guarantee. What the state and federal Constitutions secure for the accused is the right to present a defense, not merely the right to be free of unduly restrictive state laws of evidence and procedure. When, in this case, a crucial defense witness was not permitted to testify, defendant was denied that fundamental right.

## II.

### VIOLATION OF THE CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE REQUIRES APPLICATION OF THE FEDERAL HARMLESS ERROR STANDARD

Once a reviewing court determines that exclusion of defense evidence has violated the defendant's right of compulsory process, the effect of the

---

[1]Another fundamental right deserves mention in this context. As Justice Brennan has noted, "Precluding a witness based solely on a judge's belief that the witness lacks credibility might also implicate the constitutional right to a jury trial in that it usurps the jury's central function of assessing the credibility of witnesses. The constitutional right to a jury trial would mean little if a judge could exclude any defense witness whose testimony he or she did not credit." (*Taylor* v. *Illinois, supra,* 484 U.S. 400, 430, fn. 5 [98 L.Ed.2d 798, 824] (dis. opn. of Brennan, J.).)

violation on the validity of the resulting conviction is determined by harmless error analysis (*Crane* v. *Kentucky* (1986) 476 U.S. 683, 691 [90 L.Ed.2d 636, 645-646, 106 S.Ct. 2142]) using the "beyond a reasonable doubt" standard (see *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 684 [89 L.Ed.2d 674, 686-687, 106 S.Ct. 1431]).

Under this test, the appropriate inquiry is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2081], original italics.)

III.

### APPLICATION OF THE FEDERAL HARMLESS ERROR STANDARD COMPELS REVERSAL OF THE JUDGMENT

The determination of prejudice begins with an examination of the defense presented at trial, which was that defendant had consensual sexual relations with Amelia P. but did not murder her, and that his brother Gregory was the killer. The success of this defense depended in large measure on providing the jury with sufficient reasons to credit defendant's explanation and to doubt the contrary version presented through Gregory's previous statements inculpating defendant. By erroneously excluding evidence that Gregory had confessed to the killing, the trial court's ruling eviscerated this defense.

The prosecution's case was far from compelling. The murder victim's young son, Kevin, could not identify defendant, nor did he recognize the survival knife or the cut-off jeans found in the Cudjo camper. Defendant's fingerprints were not found at the victim's home, and no bloodstains were detected on any of defendant's clothing, on any articles seized from the Cudjo camper, or on the shoes seized from defendant's mother's automobile. No articles taken from the victim's residence were found in defendant's possession, nor did any witness testify to such possession.

The police inferred from their interviews with Kevin and from the shoe tracks that the murder was the work of one man. Because much of the evidence pointed as strongly to Gregory as to defendant, law enforcement suspicion initially focused equally on defendant and Gregory. Both Gregory and defendant were present in the camper to which the shoe tracks led, and both Gregory and defendant owned shoes that could have made the tracks. The cut-off jeans and the knife found in the camper were equally accessible to defendant and to Gregory.

Some of the evidence pointed more strongly to Gregory as the intruder that Kevin described. Kevin testified that the intruder, who wore a sleeveless top, did not have tattoos on his arms or any facial hair such as a mustache or beard. Defendant had tattoos on both arms, and he testified without contradiction that he had obtained them before the murder. Defendant also had facial hair on the day of the murder. Gregory, on the other hand, had neither tattoos nor facial hair.

Although the semen found on the murdered woman could not have come from Gregory, the murderer need not have been the person who was the source of the semen. The victim's body bore no signs of traumatic sexual assault, Kevin's testimony did not mention a sexual assault, and the physical evidence was consistent with defendant's account of consensual sexual relations with the victim.

Gregory's previous statements to sheriff's investigators, which closely tracked Kevin's description of the intruder's conduct and provided details about the interior of the murder victim's home, were perhaps the strongest evidence of defendant's guilt presented by the prosecution, yet this evidence too was equally if not more consistent with Gregory's guilt. Because Gregory did not testify at trial, the jury was never given an opportunity to judge his credibility by observing his demeanor under oath.

Because the trial court excluded Culver's testimony, defendant's testimony was essentially uncorroborated. Evidence that Gregory had confessed to the murder would have filled a major gap in the defense case, and would have greatly increased the likelihood of the jury's entertaining a reasonable doubt of defendant's guilt. Under the circumstances, it is not possible to conclude that the guilty verdict in defendant's trial "was surely unattributable to the error." (*Sullivan* v. *Louisiana*, *supra*, 508 U.S. __, __ [124 L.Ed.2d 182, 189, 113 S.Ct. 2078, 2081].)

## IV. CONCLUSION

Exclusion of the testimony of defense witness John Culver was error of constitutional dimension that may not be excused as harmless. I would reverse the judgment.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied Feburary 9, 1994, and the opinion was modified to read as printed above. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.