Filed 9/4/14  P. v. Piocortes CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NOE PIOCORTES,<br><br>    Defendant and Appellant. | C073935<br><br>(Super. Ct. No. 12F03649) |

A jury convicted defendant Noe Piocortes of furnishing methamphetamine to a minor, S.T., possessing methamphetamine, felony child abuse as to S.T., and misdemeanor child abuse, a lesser included offense, as to D.D.  The jury acquitted defendant of furnishing methamphetamine to D.D.

Sentenced to state prison, defendant contends the trial court deprived him of his right to a defense when the court barred him from impeaching a prosecution witness with a prior conviction for negligent discharge of a firearm, a crime of moral turpitude.  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Prosecution Case

On January 22, 2012, defendant lived in apartment number 72 at an apartment complex on Sunrise Vista Drive in Citrus Heights. Victim S.T., aged 17, lived next door in apartment number 70. He had told defendant his age when he moved in six months before. Prosecution witness Antoine Clay lived in apartment number 68.

S.T. lived with his father, but his father was not home that day. S.T. had invited his 15-year-old friend D.D. over. During the afternoon, S.T. and D.D. were drinking vodka, some inside the apartment and some outside on the balcony, where they saw defendant across the way on his balcony. S.T. asked defendant if he could buy beer for him and D.D. Defendant gave them a case of Budweiser Light. According to S.T., he had trouble recalling what happened after that because of his alcohol consumption.

S.T. testified defendant came over to S.T.'s apartment and entered the kitchen, carrying a baggie that held a white powdery substance. Defendant directed S.T. to heat up a plate in the microwave and used a credit card to cut up lines of the substance on the warm plate. S.T. ingested a line; then at some point he passed out. When he testified, S.T. could not recall how many lines he had ingested. He recovered consciousness at the hospital.

D.D. testified that he got drunk at S.T.'s apartment. He said they consumed a fifth of a gallon of vodka. D.D. did not remember how much beer he drank from the case defendant gave them. He talked to defendant outside on the landing between the two apartments and in S.T.'s living room, but did not know what defendant was doing in the apartment. D.D. did not see S.T. heat a plate in the microwave. D.D. knew he passed out on S.T.'s bed, but did not recall lying down on the bed. He also did not recall the police coming, or any interaction with S.T.'s neighbor, Antoine Clay.

Clay testified that on the afternoon of the alleged crimes, he watched a 49ers football game on television, then took his dog outside. He saw defendant and S.T. on the

2

staircase outside apartments 70 and 72. He saw another boy who looked like a teenager at the bottom of the staircase. Clay saw defendant pour himself a shot of honey-colored or gold liquid, which Clay believed to be Bacardi Gold, and give S.T. a shot. S.T. made a face after drinking it, as if it was strong. Clay did not see D.D. drink a shot, but a third shot glass was on the ground on the landing. Clay declined defendant's offer of alcohol. Defendant and S.T. returned to their apartments, while Clay and D.D. remained downstairs. D.D. was holding a Budweiser.

When defendant and S.T. came back downstairs, Clay heard S.T. ask defendant if defendant knew where to get any "cris" [*sic*], which Clay took to mean drugs. Defendant returned to the door of his apartment, and Clay saw him make a phone call. S.T. and D.D. went back to S.T.'s apartment; defendant told them he would be right back. At some point, Clay saw defendant return.

Clay went to check a pizza he was baking in his oven, then he went upstairs to check on the boys.

Through the partially open door of S.T.'s apartment, Clay saw D.D. lying flat on the ground, partly in S.T.'s bedroom and partly in the hallway. Defendant and S.T. were in the kitchen, where defendant was chopping a white substance that looked like crystal meth or cocaine. Clay saw S.T. and defendant snort the substance through a rolled-up paper or dollar bill. S.T. was visibly drunk, stumbling around, and slurring his speech. Clay warned defendant that S.T. did not know what he was doing and that it could kill him. Defendant said S.T. was old enough to make his own decisions. After snorting the substance, S.T.'s eyes rolled back in his head and he fell to the ground, apparently having a seizure; then he got up and ran to the bathroom.

Clay left and called 911. A recording of the call was played for the jury. According to the transcript of the call in the record, the information Clay provided was consistent with his trial testimony, but he gave his name as "Anthony Ray." He testified that he gave a false name because he was not supposed to be living there and feared being

evicted if the apartment manager found out he was there. (The apartment was rented by the mother of Clay's child; Clay went back and forth between the apartment and his mother's home.)

At approximately 9:40 p.m., Citrus Heights Police Officers Austin Azevedo and Vincent Young were dispatched to the apartment complex. They saw defendant leaving S.T.'s apartment and ordered him to stop. Instead, he hurried into his own apartment. They followed him inside and apprehended him. Searching defendant, they found a baggie of white crystalline substance in his sweatshirt pocket, later confirmed to be 0.10 of a gram of methamphetamine (a usable amount), a lightbulb with burnt residue inside, which they knew from their experience to be a common smoking device, and a rolled-up dollar bill.

In S.T.'s apartment, Officer Young and another officer found both boys unconscious. Later, the boys woke up and were responsive but disoriented, with incoherent slurred speech. Taken to Mercy San Juan Medical Center, S.T. was found to have a blood-alcohol level of 0.355 percent and a urine toxicology screen that was positive for amphetamines, while D.D. had a blood-alcohol level of 0.24 percent and a urine toxicology screen that was positive for marijuana. A criminalist testified that a male weighing 140 pounds, as did S.T., would have had to have consumed 12.5 to 13.5 "drink equivalents" (i.e., one-half ounce of pure alcohol or ethanol) to get to a blood-alcohol level of 0.355 percent; a male weighing 150 pounds, as did D.D., would have had to have consumed at least nine to 10 drink equivalents to get to a blood-alcohol level of 0.24 percent.

4

Defense Case

Two of defendant's roommates on the date of the alleged crimes, Jose Hernandez Castillo and Damian De Los Santos, testified on his behalf. Both stated they were home on that date. Castillo did not see defendant with drugs and did not see him give S.T. and D.D. alcohol. De Los Santos did not see defendant give the boys alcohol or drugs. S.T. and D.D. asked to come into their apartment that afternoon, but Castillo would not let them in because the boys had been drinking.

Defendant testified he watched a football game and barbecued on the balcony with his roommates that day. He saw the boys drinking vodka outside S.T.'s apartment and believed they were very drunk. He bought beer that day, but did not give the boys any alcohol or drugs.

According to defendant, he went downstairs at approximately 7:00 p.m. and saw Clay go inside S.T.'s apartment. Clay later approached defendant and offered him a bag of "chemicals," calling it "something so that [defendant] could feel fine." Clay advised him to put the substance into a lightbulb, light it, and smoke it; Clay also advised him to roll up a dollar bill for that purpose. Defendant testified he had never smoked methamphetamine before that night.

After defendant used the drugs, Clay peeked inside S.T.'s apartment, then said he would return. Instead, after approximately 10 minutes, the police came. When they arrived, defendant was in front of his own apartment, not S.T.'s. Despite an officer calling to defendant, he went into his apartment because he did not understand what the officer said.

## DISCUSSION

Defendant contends the trial court abused its discretion and deprived him of the right to put on a defense by denying his motion to impeach Clay with a 2006 misdemeanor conviction for negligent discharge of a firearm, a crime evincing moral

turpitude.  (*People v. Clem* (2000) 78 Cal.App.4th 346, 351-353; *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1092-1093.)  We disagree.

Before trial, defense counsel moved to impeach Clay with a 2009 misdemeanor conviction for false imprisonment.  The trial court granted the motion, finding under Evidence Code sections 210 and 352 that the conviction was relevant to impeach the witness's credibility, it was "relatively recent," and its probative value substantially outweighed any prejudicial effect.  Counsel impeached Clay with this prior conviction on cross-examination.

During trial, before Clay began to testify, defense counsel requested permission also to impeach him with a 2006 misdemeanor conviction for negligent discharge of a firearm, suggesting that along with the 2009 conviction it showed "sort of a continuing pattern of criminal conduct."  The prosecutor objected and asserted this second prior was "even more remote" than the 2009 conviction and had no relevance under Evidence Code section 1101, subdivision (b).  The trial court found that the 2006 conviction was "remote," "would not further assist the jury in determining credibility," and "could be misused"; therefore it would be excluded under Evidence Code section 352.

Evidence of a witness's misconduct that evinces moral turpitude and results in a misdemeanor conviction is admissible to impeach the witness.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295, 297.)  But, as with felony convictions, the trial court has broad discretion under Evidence Code section 352 to exclude such evidence if its probative value is substantially outweighed by its potential for undue prejudice, confusion, or consumption of time.  (*People v. Clark* (2011) 52 Cal.4th 856, 931.)  We review rulings under Evidence Code section 352 for abuse of discretion.  (*People v. Lightsey* (2012) 54 Cal.4th 668, 714.)  We will not disturb such a ruling unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

6

Here, there was nothing arbitrary, capricious, or patently absurd about the trial court's ruling. The court reasonably exercised its discretion to admit the more recent of Clay's misdemeanor convictions for impeachment while excluding the less recent. The court also impliedly found the conduct underlying Clay's conviction for negligent discharge of a firearm, even though evincing moral turpitude, did not bear strongly on his honesty. (*People v. Feaster, supra,* 102 Cal.App.4th at p. 1094; see *People v. Lightsey, supra*, 54 Cal.4th at p. 714 [evidence of misdemeanor conduct that does not strongly demonstrate moral turpitude does not provide jury much assistance in assessing witness's credibility].) Whether or not we might have ruled differently, we cannot find the court's ruling was an abuse of discretion.

But even if the court erred, the error was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which is the applicable standard for evidentiary errors. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Contrary to defendant's assertion, the exclusion of the 2006 misdemeanor did not deprive him of a defense. Defense counsel impeached Clay thoroughly, not only with his more recent misdemeanor conviction but with the fact that he gave a false name to 911 in order to cover up the fact that he was illegally residing in the apartment complex, and with discrepancies between his trial testimony, his preliminary hearing testimony, and his statement to the police.[1] Counsel then used this impeachment effectively by making an extended argument to the

---

[1]    As the Attorney General points out, these discrepancies included, among others: (1) variances between Clay's accounts of what type of alcohol the victims were drinking and what types of cups, bottles, or glasses they used; (2) variances between Clay's accounts of S.T.'s words in asking defendant for drugs; and (3) variances between Clay's trial testimony that defendant snorted drugs and his preliminary hearing testimony and 911 report that defendant was smoking the drugs.

7

jury, closely tied to the standard instruction on witness credibility, that Clay could not be believed on any point.**2**

In any event, S.T.'s testimony, so far as it went, corroborated that of Clay. On the other hand, defendant's claim that Clay made a gift of illegal drugs and paraphernalia to him for no apparent reason was uncorroborated and implausible on its face. So far as it was intended to imply Clay actually furnished the drugs to the victims, the jury evidently found it unconvincing, since no witness, including defendant, claimed to have seen Clay doing so, and it was not apparent why Clay would have done so and then immediately called 911 to report the crime.

Thus, even if the trial court should have admitted the 2006 misdemeanor conviction for impeachment, there is no reasonable probability that defendant would have achieved a better outcome had the court admitted that evidence.

DISPOSITION

The judgment is affirmed.

_____ NICHOLSON _____, J.

We concur:

_____ BLEASE _____, Acting P. J.

_____ HOCH _____, J.

---

**2**     In the course of this argument, counsel minimized the significance of the misdemeanor conviction with which he had been allowed to impeach Clay: "Misdemeanor conviction. Not really a big deal. I mean, it's there. He admitted that he committed a Penal Code Section 236, false imprisonment. It's something you can consider when determining if he's being honest, and the Judge will instruct you that's all it's for, is to determine that."