Filed 5/17/23  P. v. Lopez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B318338 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA062878) |
| v. | |
| ARTURO LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Blanchard, Judge.  Affirmed.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Arturo Lopez of second degree murder and found true the special firearm-use allegations. On appeal Lopez contends defense counsel provided constitutionally ineffective assistance by failing to object to certain testimony. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The First Conviction and Reversal of the Judgment*

In 2016 a jury convicted Lopez of second degree murder, conspiracy to destroy evidence, offering false evidence and three counts of possession of a firearm by a felon. On appeal we reversed the convictions for murder based on instructional error and for offering false evidence for insufficient evidence. The convictions on the remaining four charges were affirmed. (See *People v. Lopez* (Nov. 13, 2018, B277127) [nonpub. opn.].)

### 2. *The Third Amended Information*

Following issuance of the remittitur on January 14, 2019, Lopez was recharged in a third amended information with one count of murder (Pen. Code, § 187, subd. (a)).[1] The third amended information included special firearm-use enhancement allegations pursuant to section 12022.53, subdivisions (b), (c) and (d).

### 3. *The Evidence at Trial*

On the afternoon of February 23, 2014 Stephen Finson left his home in Lancaster to ride his all-terrain cycle (ATC) in the desert. When he did not return home that evening, his wife reported him missing. Finson's body was found the next morning in the desert. He had been shot in the back of the head through his helmet. The autopsy showed the bullet had entered the back

---

[1] Statutory references are to this code unless otherwise stated.

2

of the helmet, travelled through Finson's head and then through the helmet's right cheek pad. No bullet fragments were found in the wound, and no bullets or shell casings were found at or near the crime scene.

Los Angeles County Sheriff's deputies were able to trace the path of Finson's ATC and determined Finson had been heading southwest on a defined trail and then made an abrupt turn to the north into the open desert. Based on the depth of the tire tracks, deputies concluded Finson had been travelling at a high rate of speed when he turned. Finson's body was found approximately 100 yards north of the turn, and the ATC was found another 30 feet north of Finson's body.

Marco Iezza, a firearms examiner in the firearms identification section of the sheriff's department crime laboratory, testified regarding his examination of Finson's helmet. Iezza was unable to determine the precise caliber of the bullet that killed Finson; but based on the size of the entrance and exit paths in the helmet, Iezza opined it was a medium or large caliber bullet, such as a .30-caliber or .40-caliber. When given the hypothetical that the fatal shot was fired from at least 100 yards away, Iezza testified the bullet must have been fired from a rifle, not a handgun, to have the high velocity needed to pierce the helmet and go through Finson's head without leaving bullet fragments. However, Iezza stated, if a handgun had been used, the shot must have been fired from within 25 yards.

Two witnesses testified that, prior to his arrest, Lopez made incriminating statements indicating he had shot Finson. One of those individuals informed the Finson family, which led to the investigation of Lopez as a suspect. Upon executing a search warrant at Lopez's home, sheriff's deputies found a .22-caliber

rifle and a .22-caliber revolver buried at the edge of the property. They also observed a large number of spent rifle cartridges on the ground in the backyard and in burn barrels, including many .30-30-caliber rifle cartridges. While some of the spent cartridges appeared to have been outside in the elements for an extended time, the .30-30-caliber casings looked as if they had been discarded more recently.

The preliminary hearing testimony of Lopez's friend Gerardo Amaya was read to the jury due to Amaya's unavailability at trial. Amaya testified that on the day of Finson's murder Amaya and Lopez were driving in Lancaster, heading west on a road to the south of where Finson's body was later found. Lopez, who was driving, stopped the car and told Amaya he wanted to test fire a new handgun. Lopez got out of the car and went to the rear of the car. Amaya remained in the passenger seat. Amaya heard two gunshots a few seconds apart. Amaya stated Lopez had fired the gun to the north, into the desert. When Lopez returned to the driver's seat, he was holding a semiautomatic handgun, which he placed on the center console.

Christine Banghart,[2] Lopez's girlfriend at the time of Finson's death, testified Lopez owned a .22-caliber rifle with a scope and a .22-caliber handgun.

Lopez was interviewed by sheriff's deputies in April 2014 following his arrest. Recordings of portions of the interview were played for the jury. Lopez said he had owned a .30-30-caliber rifle but had destroyed it six months earlier because the pin was

---

[2] By the time of the second trial Banghart had changed her name to Christine Mangone. However, for the sake of consistency with our prior opinion and references in the record, we refer to her by her former name.

misfiring.  He used a grinder to cut it into pieces then took the metal pieces to a recycling center.  He burned the wooden parts.

Lopez did not testify in his own defense.  He presented the testimony of an independent firearm examiner, William Moore, who examined Finson's helmet and conducted various tests to determine what type of weapon could have killed Finson.  Moore concluded that, if Finson had been shot from 200 yards away, Finson was likely killed by a .357 magnum bullet fired from a handgun.  However, it was also possible Finson's killer used a .38-caliber rifle or .357-caliber rifle.  Moore did not believe a .30-caliber bullet could have created the damage to Finson's helmet.  He also stated it would take some level of proficiency to shoot a moving target from 100 yards with a .30-30-caliber rifle.

During her closing argument the prosecutor told the jury Lopez stopped his car along the roadway south of where Finson was riding his ATC and deliberately shot at Finson, likely with the .30-30-caliber rifle that he later destroyed.  Defense counsel argued that, if the jury believed Lopez shot Finson, the evidence supported a verdict of involuntary manslaughter rather than murder, because Finson had been killed accidentally while Lopez committed the misdemeanor of shooting a firearm from a public road or shooting a firearm in a grossly negligent manner.

4. *The Verdict and Sentence*

The jury convicted Lopez of second degree murder and found the special firearm-use enhancement allegations true.  The court sentenced him to an aggregate indeterminate state prison term of 45 years to life.

## DISCUSSION

1. *Governing Law and Standard of Review*

To prevail on his claim of ineffective assistance of counsel, Lopez must demonstrate his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694; accord, *People v. Centeno* (2014) 60 Cal.4th 659, 674, 676.)

When "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.) "And, even when there was a basis for objection, '[w]hether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." [Citation.] "In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission."'" (*People v. Majors* (1998) 18 Cal.4th 385, 403; see also *People v. Centeno, supra,* 60 Cal.4th at pp. 674-675 ["'[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"'"].)

2. *Testimony Regarding Lopez's Firearm Use*

On direct examination the prosecutor asked Banghart how often she had seen Lopez shoot guns on his property. Banghart

responded that Lopez would shoot daily as long as he had ammunition. He would shoot at "random stuff in the yard" or at birds. The prosecutor clarified, "Defendant wouldn't just shoot in the air; he would be targeting something, correct?" Banghart replied that was correct. During cross-examination defense counsel asked Banghart whether she had seen Lopez shoot his .22-caliber rifle in the backyard, to which she responded she had. Counsel then asked whether that was "a common occurrence." Banghart replied it was. Defense counsel then inquired about Lopez's targets and where he stood while shooting.

Additional testimony regarding Lopez's gun use was presented through the testimony of Vanessa Burkes, Lopez's former girlfriend. Due to her unavailability at trial, Burkes's preliminary hearing testimony was read to the jury. On direct examination Burkes testified she knew Lopez owned guns and had seen him with guns. On cross-examination defense counsel asked how often Burkes had seen Lopez with guns. Burkes replied, "When we lived together, he would be outside all the time shooting rabbits and squirrels. It wasn't anything unusual." She said Lopez shot rabbits and squirrels "just about every day."

During redirect Burkes stated that on more than one occasion Lopez hid behind a door with a shotgun when she came home and shot the gun in the house to scare her. She explained, "Where we lived it was like a barn, so it didn't matter if he shot through the ceiling or not." Burkes also recounted an incident approximately five years earlier when she and Lopez were fighting and she ran out of the house. As she ran down the road, Lopez shot at her twice with his .22-caliber rifle. Burkes heard the bullets go by her head, but she believed Lopez was trying to scare her rather than hurt her.

### 3. *Lopez Has Not Demonstrated His Trial Counsel Was Constitutionally Ineffective*

Lopez argues Banghart's and Burkes's testimony regarding his firearm use should not have been admitted because it was irrelevant, unfairly prejudicial and improper propensity evidence. Lopez acknowledges his counsel failed to object to the testimony and, therefore, frames the issue in terms of ineffective assistance of counsel.

Contrary to Lopez's contention, any objection to the testimony based on relevance would likely have been overruled. The prosecution's theory of the case was that Lopez purposefully shot Finson, a moving target, from at least 100 yards away. As defendant's own expert acknowledged, such a shot would require proficiency with firearms. Accordingly, Lopez's almost daily target practice, during which he often shot at small animals, was relevant to his familiarity with firearms and his ability to hit a moving target from a distance. Lopez's experience with firearms was likewise relevant to refute the defense argument that the shooting was accidental. The testimony was also relevant to undermine Amaya's testimony that Lopez had stopped along the road to test fire a handgun. Given the evidence that Lopez often shot guns on his property—even multiple times inside his home—there was no need for him to test fire a gun from the side of the road. As the prosecutor stated during her closing argument, "If he wanted to simply test fire a new pistol, he could have done it at his home at any point in time."

Lopez's argument the testimony was inadmissible due to undue prejudice also fails. To be sure, evidence he had shot at Burkes at least once and had often shot at small animals damaged his defense, but it was not overly prejudicial in the

8

sense contemplated by Evidence Code, section 352.  "'"'The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against . . . [one party] as an individual and which has very little effect on the issues."'"'  (*People v. Garceau* (1993) 6 Cal.4th 140, 178.)  "'In applying section 352, "prejudicial" is not synonymous with "damaging."'"  (*People v. Callahan* (1999) 74 Cal.App.4th 356, 371.)  As discussed, the frequency and nature of Lopez's prior firearms experience was highly probative of his ability to shoot Finson from a distance; and, while it could potentially evoke an emotional bias in the jury, that bias did not substantially outweigh the evidence's probative value.

Similarly, Lopez's argument the evidence was improperly admitted to show his "general criminal disposition and that he, willy-nilly, shot his guns all the time at anything" is without merit.  To reiterate, the evidence was offered for the non-propensity purpose of establishing Lopez's proficiency with firearms and his willingness to fire guns freely on his property.  Accordingly, any objection on those grounds would have been properly overruled.  (See Evid. Code, § 1101, subd. (b) ["[n]othing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act"]; see also *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823.)

For these reasons it was not reasonably probable the trial court would have excluded Banghart's and Burkes's testimony.  Because any objection would have been unwarranted, there was no ineffective assistance of counsel.  (See *People v. Thomas* (1992)

9

2 Cal.4th 489, 531 [failure to make meritless objection does not constitute ineffective assistance of counsel]; see also *People v. Majors, supra*, 18 Cal.4th at p. 403; *People v. Cudjo, supra*, 6 Cal.4th at p. 616.)

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.


We concur:



SEGAL, J.



FEUER, J.